Claude Bernard ROBINSON and Julia D. Robinson, Infants, by Melvin Robinson, their father and next friend, et al., Plaintiffs,

United States of America, Plaintiff-Intervenor,

Edgar Bennett Morgan, Sr., father and next friend of Edgar Bennett Morgan, Jr., Plaintiff-Intervenor,

Billy Joe Anthony, father and natural guardian and next friend of Jerry Wayne Anthony, Plaintiff-Intervenor,

v.

The SHELBY COUNTY BOARD OF EDUCATION et al., Defendants,

Board of Education of the City of Memphis, Defendant.

(in limited capacity through intervening complaint of above-named Anthony).

Civ. No. 4916.

United States District Court, W. D. Tennessee, W. D.

June 23, 1971.

Supplemental Opinion Aug. 11, 1971.

Memorandum Decision Aug. 31, 1971.

William E. Caldwell, Ratner, Sugarmon & Lucas, Memphis, Tenn., Jack Greenberg, New York City, for plaintiffs Robinson.

Paul Hancock and Ben L. Krage, Civil Rights Division, Dept. of Justice, Washington, D. C., for intervening plaintiff the United States.

James A. Crislip, Crislip & Blount, Memphis, Tenn., for intervening plaintiff Morgan.

Harold C. Streibich, Memphis, Tenn., for intervening plaintiff Anthony.

R. Lee Winchester, Jr., Memphis, Tenn., for defendant Shelby County Bd. of Education.

Jack Petree and Ernest G. Kelly, Jr., Evans, Petree & Cobb, Memphis, Tenn., for defendant Bd. of Education of the City of Memphis.

## MEMORANDUM DECISION AND ORDER

BAILEY BROWN, Chief Judge.

The last opinion of this Court in this case was filed on April 6, 1970 and is reported in 311 F.Supp. at 97. As is reflected by that opinion, this Court concluded that the Board's tendered plan met the test of constitutionality and therefore we approved such plan. As is also reflected in that opinion, the Title IV Center of the University of Tennessee largely agreed with the Board's plan, though it suggested several changes, and the original plaintiffs and the Department of Justice largely agreed with the plan as it would be amended by the suggestions of the Title IV Center.

In an opinion filed on May 10, 1971, 442 F.2d 255, our Court of Appeals remanded this case for reconsideration in the light of the most recent decisions by the Supreme Court. Judges Weick and Miller, in concurring in the remand, did not state whether or not they thought that the desegregation plan approved by this Court meets the requirements of those decisions. However, the principal opinion, by Judge McCree, does make it clear that, in his view, the plan does not meet those requirements, and in his opinion Judge McCree pointed out that additional integration could be accomplished by following the suggestions of the Title IV Center.

It therefore appeared to this Court that a revision of the plan as had been suggested by the Title IV Center, and as had largely been concurred in by the original plaintiffs and the Department of Justice, would be all that the law requires and would satisfy all concerned. Moreover, we were desirous of holding the necessary hearing and making the decision as soon as possible because school begins on August 15, 1971. Accordingly, on May 13, 1971, we ordered the parties to confer with each other to determine what their differences were, ordered a pre-trial conference to follow on May 28, and ordered that the hearing would be held and the decision would be made by June 23, 1971.

At the pre-trial conference on May 28, we entered an order that was substantially in the form tendered by original plaintiffs and which ordered the Board

to file its plan within two weeks, and on June 10 we set the hearing for June 21.

The Board timely filed its plan, which encompassed some, but not all, of the suggestions that had been made by the Title IV Center, and the Title IV Center promptly filed its comments and suggestions. The original plaintiffs promptly filed objections to most of what the Board and the Title IV Center proposed, and on their representation that they desired to file an alternative plan, we ordered the Board to furnish them all available information. In the meantime, counsel for the Board became involved in a trial in state court but we were able to get him excused for the morning of the hearing in this court. At the beginning of the present hearing on June 21, the Department of Justice also filed objections to most of what the Board and the Title IV Center proposed.

As indicated by their objections filed and as also indicated by their questioning of the Board and the Title IV Center witnesses at the hearing, the original plaintiffs and the Department of Justice are in almost total disagreement with the plan tendered by the Board, even as it would be amended by suggestions of the Title IV Center. Thus the original plaintiffs and the Department of Justice have escalated their demands since our 1970 ruling. Their position seems to be that the Charlotte-Mecklenburg decision [Swann v. Charlotte-Mecklenburg Board of Education], 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), justifies and indeed requires such escalation, though there clearly is nothing in that decision that these parties did not contend to be the law when they addressed this court at the 1970 hearing.

It therefore has become obvious to the Court that we cannot, as we had contemplated, dispose of this remand simply on the basis of the plan tendered by the Board, as it would be amended by the suggestions of the Title IV Center, plus some limited amendments suggested by the original plaintiffs and the Department of Justice, because the demands of the latter two parties would require wholly new plans. We have therefore abandoned our intention to make a ruling by June 23 and are requiring the original plaintiffs and the Department of Justice each to file wholly new and entire plans and to include in such plans provisions with respect to future building and the cost thereof and provisions with respect to additional transportation and the cost thereof. The Board will cooperate with such parties in making available to them all the information it has that will aid them in preparing such plans. The original plaintiffs, however, need not include such cost projections unless they choose, since they represent that they do not have the financial resources to obtain such projections. These plans must be filed no later than July 15, 1971. We will set a date for response by the Board and for comments by the Title IV Center after such plans are filed.

Since the beginning of school will be so imminent when the plans of the original plaintiffs and the Department of Justice are filed and since thereafter time must be allowed for responses and for a hearing, the Board may, in planning for the coming school year, assume, until this Court orders to the contrary, that it may follow the plan as tendered by it, except for projected building, as such plan would be amended by the suggestions of the Title IV Center.

In Charlotte-Mecklenburg, the Supreme Court said 402 U.S. p. 15, 91 S.Ct. p. 1275): "The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation." We require original plaintiffs and the Department of Justice to file with their plans a brief on the question whether all situations in which Negroes are in the majority are conclusively to be presumed to have resulted from state-imposed school segregation or whether a factual investigation is necessary to determine whether, and to what extent, such situations are attributable to state-imposed school segregation.

It is so ordered.

## SUPPLEMENTAL OPINION

The last full opinion this Court filed in this case, which involves the desegregation of the Shelby County, Tennessee school system, is reported in 311 F.Supp. at 97 (W.D.Tenn.1970). Upon appeal, the Court of Appeals for the Sixth Circuit remanded in an opinion reported in 442 F.2d at 255 (6th Cir. 1971) for reconsideration in the light of Swann v. Charlotte-Mecklenburg, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

In the hope of making an early determination upon the remand, we held a hearing on June 21, 1971, but it developed at that hearing that both the original plaintiff, the NAACP [1], and the intervening plaintiff, the Attorney General, objected in large measure to the most recent plan submitted by the defendant Board even as such plan would be amended by the suggestions of the experts of the Title IV Center of the University of Tennessee. We therefore terminated that hearing and filed a memorandum and interim order on June 23, 1971 requiring the NAACP and the Department of Justice to submit alternative plans.

Since then the Department has filed a plan, but the NAACP has not, the NAACP contending that it could not do so without the help of an expert with staff which it could not afford, and this Court would not order the defendant Board to pay the expense of such expert with staff.[2] This Court also has allowed certain interested white parents and pupils to intervene and has allowed the joinder as a defendant of the Board of Education of the City of Memphis for the limited purpose hereinafter indicated.[3]

A hearing was held on August 2–6, 1971 to consider all of the plans before the Court. The purpose of this memorandum is to apprise the parties of the decision of the Court and particularly to apprise the defendant Board of what is required of it upon the opening of school for the 1971–72 school year.

Before dealing with the specific proposals involved here, we believe it would be well to discuss the general principles to be applied particularly in the light of Swann, supra.

■■ Swann makes it clear that the proper aim of these desegregation cases is to do away with state-imposed school segregation. Conceivably, the Supreme Court could have held that equal protection requires doing away with segregation in the schools no matter what are the causes of such segregation or in any event that equal protection requires doing away with segregation in the schools causally related to state-enforced policies other than school segregation, but the Court expressly declined to so decide. Nevertheless, where a school board's plan proposes the continuation of schools that are all or predominately of one race, there is presumption that the racial composition of such schools is a vestige of de jure segregation which places the burden on the school board to show that such assignment of pupils is genuinely non-discriminatory.

■ It further appears that state-imposed school segregation and its vestiges have been done away with when the school system has become "unitary" and that a system can be said to be unitary when the schools are no longer "racially identifiable."

■ While the ratio of white to black pupils in a school, as compared

---

1. In accord with reality, we are now referring to the NAACP Legal Defense Fund as the original plaintiff in this case.

2. It should be noted that the experts of the Title IV Center of the University of Tennessee are now and have been in

this case at the specific request of the NAACP.

3. The school system of the City of Memphis is the only public system in Shelby County that is not operated by the defendant Board.

with the ratio in the system as a whole [4], is a highly important factor in determining whether a school is racially identifiable, it is not constitutionally required that each school in the system have approximately the same ratio of whites to blacks as does the system as a whole and some all-black (or white) or nearly all-black (or white) schools may exist in a desegregated system. It is the contention of the Department of Justice and the NAACP, in this connection, that even if, as a result of desegregation procedures, there are no longer any schools in this system that are identifiably black but there remains a school whose pupils are all or nearly all white, this school must be "treated" with some black pupils if it is feasible to do so.[5] While there is language in Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), that conceivably supports this contention, we do not believe that the Supreme Court held the equal protection clause to be that quixotic in purpose.

■ In addition to the racial composition of the student bodies, other important indicia of a unitary system are the racial composition of faculty and staff in each school and the facts with respect to desegregation of extra-curricular activities and transportation.

■ Equitable principles are to be applied in fashioning the remedies to bring about a unitary system. Included among such remedies that may be used are the imposition of approximate pupil and faculty racial ratios, and the use of gerrymandered zones and non-contiguous zones, and the pairing and clustering of schools, and even the busing [6] of pupils. In selecting the remedies that may be used, the necessity for and the feasibility of the remedy should be the considerations. So long as a

school remains racially identifiable, it is absolutely required that optional majority to minority pupil transfers be allowed with necessary transportation paid for by the school board.

■ Once a school system has reached a state of constitutional grace—that is— has been desegregated, later segregation not caused by policies of state agencies need not be treated. However, it is the duty of the District Courts to consider the future plans of the school boards, such as building plans, in the light of their effect on resegregation.

While, as has been said, the question whether the schools are racially identifiable is the question to ask when determining whether a system is unitary, the answer to this question is not so simple. As stated, the opinion in *Swann* points to the racial makeup of the student bodies and the faculties and staffs and to the desegregation of extra-curricular activities and transportation as important factors of identifiability. But it appears that these alone are not the only objective factors to be considered and that subjective factors should also be considered. The expert who testified in this case in support of the plan of the Department of Justice gave the opinion that the history of the school—whether, for example, it was built and was formerly operated as a black school—is an important factor. Thus he said that a school that the defendant Board would open for the coming year as a high school with a ratio of blacks to whites of about two to one remains racially identifiable as a "white" school because it has historically been a white school. This same expert also testified that a school that has historically been black and has been desegregated with only a minority of whites can nevertheless be accepted as not racially identifiable if the whites do

---

4. In this system the ratio of whites to blacks is, approximately, seven to three.

5. To "treat" a school in the language of desegregation experts means to send blacks or whites to a school to create a desired racial composition.

6. Although Webster spells the word "bussing" and allows no alternative spelling, we have adopted the general practice of the media and others of spelling it "busing."

not flee and remain in the school and therefore the school is stable. Thus racial identifiability depends at least in part on how the community thinks of the school.

As stated, in *Swann* the Supreme Court held that busing of pupils may be used as a remedy to bring about a unitary system where necessary and feasible. However valid the arguments against the feasibility of busing may or may not be in a school system that has not bused pupils in the past, the argument against such feasibility here is greatly undercut by the fact that the Shelby County system has bused pupils for a long time and has bused as high as twenty thousand pupils. Indeed, in the days of segregation it bused blacks past white schools and whites past black schools. All pupils who live as much as a mile and a half from their schools have been entitled to be bused to school. However, while busing and more particularly additional busing are generally feasible, since such costs money and places some burden on pupils, white and black, who otherwise would not have to be bused, this cost and burden should be weighed against the real necessity of such busing in bringing about a unitary system.

As heretofore indicated, the defendant Board has filed another proposed plan, following the remand of this case, to which the Title IV Center has suggested some amendments, and the Department of Justice has filed a proposed plan but the NAACP has not. The NAACP, while contending that the Department's plan does not go far enough,

prefers it to the Board's plan as the latter would be amended by the suggestions of the Title IV Center. These plans, plus some additional alternatives that were suggested by others, were explored at the most recent hearing.[7]

There is no question but that the plan proposed by the Department would come closer than the Board's plan, as amended by the suggestions of the Title IV Center, to creating a racial ratio in each school that approximates the ratio in the system as a whole. It is also clear that the Department's plan would require substantially more busing, though it is not clear as to how much more would be necessary. It is further clear that the additional buses could not be obtained for the coming year because they are generally unavailable and that to carry out the Department's plan at this time it would be necessary to stagger the daily starting times of the schools. As will be seen, the plan approved herein is basically the defendant Board's plan, as amended by the suggestions of the Title IV Center, but it contains some of the features of the Department's plan and the proposals of intervening pupils and parents.

With respect to the defendant Board's plan for secondary schools, the Title IV Center made no suggestions for changes, while the Department of Justice plan would require different zoning of one high school with which the NAACP agrees.[8] We refer now to the high school which will be located at the Barret's Chapel school building or the Bolton school building. To place the

7. No question has formally been raised with respect to failure to desegregate faculty, staffs, extra-curricular activities and transportation, though when the Court alluded to the fact that at least we do not have a problem in those areas, counsel for the NAACP pointed out that faculty desegregation is not yet mathematically exact.

8. The NAACP also contends that, contrary to the Board's plan, Mt. Pisgah, historically a black high school and still heavily

black, should not be closed and the pupils transferred to schools wherein the ratio of whites to blacks would be substantially higher. The Board desires to do this, it contends, because Mt. Pisgah high school student body is too small and remains nearly all black. The NAACP contends that Mt. Pisgah should be kept open, and whites transferred to it, because of the burden on the black pupils of transferring and because of their emotional attachment to this black high school.

problem in context, it is necessary to review briefly some history.

■ In a large agricultural area in the northeast part of the county, there have been two schools to serve the area. The pupil population of the area is about two blacks to one white and the black and white pupils are fairly evenly distributed over the area.[9] Barret's Chapel has been a black elementary and secondary school and Bolton has been a white elementary and secondary school. During the years of freedom-of-choice (1963 to 1970–71) there was practically no change in racial composition of the schools. In 1970–71, pursuant to approval by this Court, Barret's was the elementary and secondary school for a newly-created separate zone covering the northern part of the area and Bolton was the elementary and secondary school for a newly-created separate zone covering the southern part of the area. For the coming year, the Board proposes, with the concurrence of the Title IV Center, to pair the two schools, with Barret's being the elementary school and Bolton being the high school for the entire area. This would place, due to the racial composition and the even distribution in the area, about two blacks to one white in each school. The Department of Justice plan would extend the zone of the secondary school to the west to include some whites in the Navy Base area at Millington.[10]

■ It is the view of this Court that neither Barret's elementary school nor Bolton High School need be treated. We so conclude for the reason that substantially all of the evidence introduced in this case in the various proceedings supports the proposition that the con-

templated racial composition of these schools would be the same if there had never been de jure school segregation applicable to the area they serve. Thus the racial composition of these schools cannot be said to be a vestige of state-imposed segregation. Even if, in determining whether these schools must be treated, we would be required to consider the use of some of the pupils in this area to treat surrounding schools, the answer is the same since we do not believe that the surrounding schools need be treated.

We therefore approve the defendant Board's plan for secondary schools.

The Title IV Center had suggested at the hearing prior to the 1970–71 school year that Coro Lake and nearby White's Chapel elementary schools be paired because Coro Lake had a white to black ratio of three to one while White's Chapel was all black. We did not require this, and the principal opinion in the remand decision of the Court of Appeals indicates that we should have. Accordingly, in our interim order of June 23, 1971, we required that the two schools be paired. However, on motion of an intervening Coro Lake pupil and parent, we thereafter required the joinder of the Board of Education of the City of Memphis to allow us to consider the possible pairing of a nearby city school, Westwood. This was particularly appropriate since both Coro Lake and White's Chapel will be in the city system by annexation in one year and because pupils living in the county have been allowed to attend Westwood. We have concluded that the appropriate action is to allow Coro Lake to remain as it is with a white to black ratio of three to one and to desegregate White's

---

9. Generally, however, the white and black pupil population of the county is not evenly distributed.

10. The Department also would make Barret's, rather than Bolton, the high school for the reason that, it contends, it is a superior facility to Bolton for this purpose, with which the NAACP agrees. The Title IV Center believes there is no real

choice between the schools for this purpose. The NAACP also contends that Barret's should be the high school because high schools have more standing in the public eye than do elementary schools and that therefore Barret's, as the last remaining formerly black high school, is an emotional symbol to blacks. These, we believe, are not constitutional considerations.

Chapel in an arrangement with Westwood. If all the elementary pupils living in the county but allowed to attend Westwood (which are predominately white) are by zoning required to attend White's Chapel and if a sufficient number of black pupils attending White's Chapel are by zoning transferred to Westwood to make room for such pupils, White's Chapel will then be predominately white. It will be necessary for the defendant Board to furnish transportation to those county pupils being transferred to Westwood who live more than a mile and a half from that school. This action is satisfactory to the Department and the NAACP as a means of desegregating White's Chapel.

Three elementary schools, Capleville, Woodstock and Arlington, which have black to white ratios of, respectively, three to one, two to one, and three to two, are, in the opinion of the Title IV Center, probably stable and need not be treated. The Department generally agrees.[11] In this connection, it is interesting to note that at a prior proceeding some white parents, whose children were to be sent to Germantown where they would be in a white majority, asked that their children be zoned into nearby Capleville where they would be in a minority. As the expert offered by the Department testified, it would be interesting to ascertain whether these schools can remain stable with a black majority. It may well be that the facts that these are rural areas in which the pupils and parents tend to know each other make for stability.

With respect to the Barret's Chapel elementary school zone as proposed by the defendant Board, the Title IV Center concurs. The Department of Justice plan would treat this elementary school by zoning pupils in grades one through five in the western part of the Board's zone into Millington East Elementary school and by zoning pupils in grades six through eight in the Board's Millington East zone to Barret's Chapel. Under the Board's plan Millington East would have 149 black pupils and 971 white pupils and thus would have significant integration. For reasons already stated, we do not believe that Barret's Chapel requires treating.

Due to the recent fire that destroyed most of the Millington Central elementary (grades one through six) school building, the defendant Board has leased a parochial school building in that area. It proposes to place some of the pupils (grades one and two) from the burned school in the parochial school building, place others (grades three and four) in the E. A. Harrold Elementary school building, and place the remainder (grades five and six) in temporary rooms on the Millington Central site. Since this arrangement adds white pupils to Harrold (quite likely already stable with a substantial minority of white pupils) and since the proposed new middle school for Millington to open with the 1972–73 year [12] will remove any remaining doubt that Harrold is fully desegregated, we approve the Board's proposal. For completeness, we should state that an alternative proposal made by the defendant Board's superintendent while on the witness stand, which we will not describe, is preferable to the one just described but is not required.

Since filing its proposed plan subsequent to the remand of this case, the defendant Board, consistent with the suggestions of the Title IV Center, has amended its plan so as to pair Germantown and Riverdale elementary schools. Germantown has a white to black ratio of about four to three while Riverdale, in a contiguous zone, has no appreciable

---

11. The Department's plan would send grades six through eight from Capleville to Germantown, but this would have no appreciable effect on the remaining ratio at Capleville and Germantown clearly does not need treatment with more blacks.

12. All agree that this middle school should be built, and we approve such construction.

number of blacks.[13] The superintendent of the county system testified that, rather than to pair these schools, it might be preferable to simply send some blacks in the Germantown zone to Riverdale and send some whites in the Riverdale school to Germantown, each remaining as a grade one through eight school, and that this can be done without a substantial increase in busing. We believe that either approach will satisfy the law so long as the white to black ratio in Riverdale and Germantown becomes approximately the same.

We further approve the Board's proposal to close the James (majority white) and Cordova (majority black) elementary schools before the 1972–73 year and to send the James pupils to Mt. Pisgah elementary and to divide the Cordova pupils between Mt. Pisgah and Riverdale-Germantown. However, though Mt. Pisgah will then serve a large rural area in which it sits at the center, it still will be predominately black. Accordingly, we believe the defendant Board should defer building an elementary school on Whitten Road, as it now proposes, to allow the Court to investigate further the placing of such school in such a location that it would aid in further desegregating Mt. Pisgah. This deferral is the recommendation of the Title IV Center.

The Title IV Center originally suggested that Ellendale elementary (white to black ratio of about four to one) be closed and the pupils sent to Shadowlawn elementary which is heavily black. This would, however, have still left Shadowlawn heavily black. We did not approve this, and the principal opinion in the remand decision indicates that we should have. Upon filing its proposed plan following the remand, the defendant Board proposed such closing of Ellendale and the Title IV Center concurred, and we approved this in our interim order of June 23, 1971. The Department of Justice plan would form a cluster of several heavily white schools with Shadowlawn so as to leave the upper grades in Shadowlawn for all the schools in the cluster and to distribute the Shadowlawn pupils in the lower grades among the other schools in the cluster. Under this arrangement, Shadowlawn and the other schools in the cluster would have about twenty-five per cent black pupils. The Title IV Center prefers this approach to that of simply closing Ellendale and transferring its pupils to Shadowlawn, but it went along with the latter proposal because some of the schools in the proposed cluster are shortly to be taken into the City of Memphis. We agree that such a cluster is the only way to desegregate Shadowlawn, and the problem becomes which schools should be included in the cluster with Shadowlawn. Certainly those relatively nearby elementary schools that are not shortly to be taken into the city must be included, because if this were not done, upon annexation Shadowlawn would be heavily black again. This means that Ellendale elementary, which is not to be annexed soon, and Bartlett elementary, which cannot be annexed because it is in the incorporated town of Bartlett, must be included. The Elmore Park elementary zone is now the subject of litigation between Memphis and Bartlett as to which is entitled to annex the area; it should be included in the cluster since the litigation will in any event defer its annexation by Memphis and if Bartlett prevails, the defendant Board can continue Elmore Park in the cluster. Although the Raleigh-Bartlett Meadows and most of the Brownsville elementary school zones will be effectively annexed by Memphis in

13. More accurately, the Board has admitted the feasibility of such pairing but contends that Riverdale need not be treated since it was recently constructed for a unitary zone at which time it had about twenty per cent black pupils and that the blacks have since sold their property to subdividers and moved out of the zone. We do not, however, believe that such a short history as a desegregated school could qualify Riverdale as being constitutionally immune to present treatment.

the summer of 1973, we see no reason why they should not be included in this cluster for the present.

■ With respect to the distribution of grades between Shadowlawn on the one hand and the other schools on the other hand, the defendant Board prefers to keep only grades seven and eight at Shadowlawn. Since such proposal would effectively desegregate the schools in the cluster, we see no objection to this proposal.[14]

Both the Department and the Title IV Center agree that the Jeter and Lucy elementary zones (about three whites to one black) and the Collierville zone (about equal whites to blacks) should be approved and we do so. With respect to the Egypt, Scenic Hills, Spring Hill and Coleman zones as proposed by the defendant Board, all heavily white, the Title IV Center concurs. All of these except the Egypt zone are to be effectively annexed by Memphis by the summer of 1973 and the Egypt zone is under annexation study. The Department of Justice would have put Egypt in the cluster with Shadowlawn and would have left out Elmore Park (which it would treat by adding blacks from the "Bridgewater" area across the interstate highway from the Board's proposed Elmore Park zone). The NAACP contends that these schools cannot be left heavily white and must be treated. The theory of the NAACP in this connection seems to be that blacks must be sent to these schools, not because of any advantage to the blacks in going to school with whites

and not even to enforce the right of the black pupils to go to a school that is not racially identifiable, but only to enforce the claimed right of black pupils to go to a school *in a system* in which none of the schools is racially identifiable.[15] We approve the zones for these schools as proposed by the Board.

Our rulings now in effect with respect to individual transfers will remain in effect.

A decree will be prepared for entry consistent with this opinion.

## MEMORANDUM DECISION ON MOTIONS TO INTERVENE

Subsequent to our memorandum decision of August 11, 1971, ante, certain white pupils and parents have moved to intervene for the purpose of obtaining a rehearing in order that they may object to and secure a stay of implementation of a ruling in that decision. These parties object to the clustering of certain predominately white schools (Brownsville, Bartlett, Raleigh-Bartlett and Elmore Park) with predominately black Shadowlawn school and seek to have the Court stay its implementation. The NAACP, as well as the white pupil and parent who intervened because of their interest in predominately white Ellendale school which is also in the cluster, oppose the sought-for interventions. The Department of Justice does not oppose the interventions, provided such does not "delay the opening of school on a desegregated basis." *

---

14. While agreeing generally with the clustering of these schools, the NAACP contends that more than grades seven and eight should remain at Shadowlawn so that fewer black children now attending that school will have to bear the burden of transferring. We do not, however, believe that this consideration rises to constitutional proportions.

15. At the same time, as has been seen, the NAACP has made arguments for maintaining Mt. Pisgah as a high school and for making Barret's, rather than Bolton, a high school which amount to

the proposition that some schools should be retained because of their black identity. Actually, one of the great practical problems in desegregation is getting whites who are assigned to schools that have, merely because of their very names or for other reasons, a black identity, to stay there.

* There is no reason to believe, however, that the Department of Justice no longer supports its contention that Shadowlawn should be desegregated by clustering. It was the Department, of course, that advocated this solution to the problem.

The schools have opened since the filing of the intervening papers.

No request has been made for oral argument of the motions to intervene pursuant to Rule 9(c) of the Local Rules.

In general, the parties who desire to intervene contend that they should be allowed to do so because other interested white parents and pupils were allowed to do so, because the Court erred in its ruling, and because they have not had a "day in court" with respect to the clustering of their schools.

It is true, of course, that we did allow intervention on the part of white pupils and parents who are interested in Coro Lake and Ellendale schools. However, these interventions were sought well before the plenary hearing of August 2–6, 1971, there was no objection to such interventions, and the intervenors made alternative proposals that were different from any made by the defendant Board and that, if adopted, would apparently bring about at least as much desegregation as the proposals that they opposed. Here, on the other hand, the interventions are sought after the memorandum decision following the plenary hearing has been filed, there are objections by other parties to the interventions, and there is no solution offered for the desegregation of Shadowlawn school.

These parties now seeking intervention excuse their lateness by alleging that they were assured by the defendant Board that the hearing to precede the opening of school for the current year would not affect them and that the first inkling that the schools in which they were interested were to be clustered was a newspaper account of the last day of the August 2–6 plenary hearing. If the defendant Board did indeed make such a representation, these parties should have known that the Board was not in position to give such assurances. Further, Brownsville school was in the clustering proposal in the Department of Justice

plan filed on July 15; and this same plan, while not placing Elmore Park school in the cluster, proposed some substantial changes in its zone so as to increase black enrollment there.

In any event, the defendant Board did, at the hearing, support the proposal that Ellendale school be closed and the pupils be transferred to Shadowlawn and did not support a clustering arrangement. We did not adopt this proposal to close Ellendale because, while it would desegregate Shadowlawn to an extent, it would have left it, even if all the whites from Ellendale attended, with 521 black and only 226 white pupils. On the other hand, clustering of Shadowlawn with other schools, whether as proposed by the Department of Justice or as set out in our memorandum decision, should give each school a white to black ratio of about four to one. As stated, those who seek to intervene have made no alternative proposal to desegregate Shadowlawn; if, by inference, they support the closing of Ellendale, this has already been considered by the Court. It is clear that Shadowlawn, sitting as it does on the edge of the largest concentration of white pupils now in the county system, can feasibly be desegregated by clustering with the predominately white schools in the area and, being feasible, this must be done now, not next year or later. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716; Alexander v. Holmes, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19.

In their intervening papers, the parties seeking intervention speak almost as if busing were new to this county system. This is not true, as is pointed out in our August 11 memorandum decision. It is true that, while some of the involved pupils have heretofore been bused, other pupils who have not been bused in the past will have to be bused under this clustering arrangement. But there is not even a contention that the defendant Board cannot do this with its present supply of busses. And no pupil

who is being bused because of this clustering arrangement will have to travel as far as some pupils who are being bused in other school zones in this system not a part of this clustering.

There is also complaint in the intervening papers about children from the same family being spread among as many as four schools. If this has happened, we cannot see why this should be necessary, for those in grades seven and eight would have to attend Shadowlawn and the others could be assigned to only one of the other schools in the cluster all of which have the first through the sixth grades.

It is clear that these parties cannot intervene as of right, for the purpose of obtaining a rehearing, under Rule 24(a) (2), F.R.C.P., since their interest was adequately, if unsuccessfully, protected by the defendant Board at the hearing. Further, we cannot allow a permissive intervention for that purpose under Rule 24(b) because, aside from the lateness of the application, intervenors simply have advanced no new plan for the desegregation of Shadowlawn school at any time, let alone for the current year. This ruling does not, of course, preclude an application for intervention for a new hearing (not a rehearing) which does offer a realistic new proposal to desegregate Shadowlawn school; but upon the filing of such an application, we could not stay the implementation of the present clustering arrangement. Also, this ruling does not preclude another application to intervene, not for a rehearing here, but simply for the purpose of appealing if the defendant Board does not appeal our ruling with respect to this clustering arrangement; an intervention for such limited purpose could be allowed. 3B Moore's Federal Practice ¶ 24.13 [1].

An order will be prepared for entry consistent with this memorandum decision.