Claude Bernard **ROBINSON** et al.,
Plaintiffs-Appellants,

v.

**SHELBY COUNTY BOARD OF EDUCA-TION** et al., Defendants-Appellees.

No. 71–1966.

United States Court of Appeals,
Sixth Circuit.

Sept. 21, 1972.

William E. Caldwell, Memphis, Tenn., Ratner, Sugarmon & Lucas, Memphis, Tenn., Jack Greenberg and Norman J. Chachkin, New York City, on brief, for plaintiffs-appellants.

Lee Winchester, Memphis, Tenn., and Thomas M. Keeling, Washington, D. C., Goff, Winchester & Walsh, Memphis, Tenn., David L. Norman, Asst. Atty. Gen., Brian K. Lindsberg, Joseph D. Rich and Paul F. Hancock, Thomas M. Keeling, Attys., Dept. of Justice, Washington, D. C., on brief, for defendants-appellees.

James A. Crislip, Memphis, Tenn., for intervenor.

Before WEICK, McCREE and MILLER, Circuit Judges.

PER CURIAM.

This is an appeal from an order of the district court approving the revised desegregation plan submitted by the school board of Shelby County, Tennessee.[1] The litigation has a long and complicated history reflected by the numerous opinions of the district court and of this Court. Two of the district court's opinions are reported at 311 F.Supp. 97 (W.D.Tenn.1970) and 330 F.Supp. 837 (W.D.Tenn.1971). The most recent consideration of the case by this Court consists of three opinions in Robinson v. Shelby County Board of Education, 442 F.2d 255 (6 Cir. 1971). Judge McCree's opinion recites the history of the litigation, states his views as to the applicable principles of law, and concludes by remanding the action for further proceedings in accordance with his opinion. Judge Miller concurred in the result reached by Judge McCree, but pointed out that upon the remand the district judge would have the benefit of the most recent rulings of the Su-

---

1. This Court recently permitted a partial remand to the district court to consider a petition of the school board to make certain modifications in its plan for the 1972–73 school year. After such partial remand, the district judge held an evidentiary hearing and by his order of August 4, 1972, approved two modifications which had been agreed to by the parties; viz. the retention of E. A. Harrold School for the 1972–73 school year and the transportation of some students (predominantly white) to Scenic Hills. However, he took under advisement, pending further orders, the request of the school board to allow the Cordova School and George R. James School to remain open for that year.

preme Court in this area, such rulings being the Supreme Court's decisions in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1970), Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed. 2d 577 (1970), and other cases decided on the same date. Judge Weick's opinion concurred "only in the remand of the case without vacating the order of the District Court, for the reasons stated by Judge Miller, which remand will afford the District Court opportunity to consider the case in the light of the recent decisions of the Supreme Court."

Following the remand the district judge conducted a full and exhaustive hearing with respect to a number of proposed plans and objections. The hearing began on August 2 and extended to August 6, 1971. On August 11, 1971, he filed a memorandum opinion approving a revised plan proposed by the school board and rejecting other alternative plans.

It is apparent from the August 11, 1971, opinion of the district judge that he correctly stated and applied the principles enunciated by the Supreme Court in Swann, supra; that by approving the school board's plan he required substantial additional desegregation of the schools in the system; and that he made detailed findings of fact on all crucial aspects of the case.

We are of the opinion that the findings of fact of the district judge are not clearly erroneous and that he complied not only with the legal principles of Swann, but also with our remand of May 10, 1971. We find it unnecessary to discuss further the facts of the case and the issues presented as they have been so fully explored and set forth in the opinions of the district court and of this Court referred to above.

We find that the opinion and order of the district court accomplished meaningful and substantial desegregation of the Shelby County school system and that in approving the latest plan of the school board the district judge did not abuse his discretion or exceed his broad equitable powers to fashion an appropriate remedy. Cf. Swann, supra, at 16, 25–26, 31, 91 S.Ct. 1267.

For the reasons set forth by the district judge in his exhaustive opinion of August 11, 1971, his order entered pursuant thereto is hereby affirmed. We also affirm his order of August 4, 1972, relative to modifications of the school board plan. The district court will retain jurisdiction of the action and any party will have leave to apply to the court for any further changes that should become necessary.

McCREE, Circuit Judge (dissenting in part and concurring in part).

I regret the necessity of filing this separate opinion, and do so only because the per curiam opinion approves some findings and conclusions that the District Court did not make, and others that are, in my view, erroneous. I view with respect and admiration the conscientious and skillful effort of the District Judge to accomplish the constitutionally mandated desegregation of the Shelby County Public Schools, and, since he will retain jurisdiction of this action until that task is completed, I believe we should give him and the other District Judges in our circuit our court's interpretation of the principles enunciated in Swann and Davis, two cases that have received extensive and differing interpretations in other districts and circuits and in scholarly and other commentary.

This is an appeal from an order intended to accomplish the desegregation of the Shelby County (Tennessee) Public Schools. Appellants initiated this action to obtain relief from state-imposed segregation of school children by race more than nine years ago. A general review of the history of this school system will assist in an understanding of the issues in this appeal and in an appreciation of the difficulty of their resolution, as will reference to a map of the school district I have appended to this opinion. A recent history of this litigation is set forth in our most recent opinion in this case, and in the two most recent pub-

lished opinions of the District Court. Robinson v. Shelby County Board of Education, 442 F.2d 255 (6th Cir. 1971), remanding 311 F.Supp. 97 (W.D.Tenn.), on remand, 330 F.Supp. 837 (W.D.Tenn. 1971).

The jurisdiction of the defendant Board of Education includes all of Shelby County, Tennessee, except the city of Memphis. The county is bounded on the west by the Mississippi River, which separates it from Arkansas, and on the south by the State of Mississippi. Memphis, which is situated in the county's southwest corner, is the largest city in Tennessee and is a major commercial and financial center. Shelby County outside Memphis is very similar to nearby rural areas in Mississippi and Arkansas. Its principal products are cotton and livestock. M. Barone, G. Ujifusa, and D. Mathews, The Almanac of American Politics 770–775 (1972).

None of the parties denies that, for many years, the Shelby County public schools have been unconstitutionally segregated by law,[1] and, in some parts of the county, no schools were provided nor was there any transportation for Negro children. As more schools were built, and bussing increased, pupils of different races were cross-bussed to prevent racial integration. During the middle 1960's, after the commencement of this litigation, a "freedom of choice" plan was instituted by defendants, but it was found to be insufficient to desegregate the schools and additional affirmative relief was ordered by the District Court. Appellants contend that even further measures are required to desegregate the county's schools adequately.

We have stated the standard to be used in determining whether a desegregation plan fulfills a board of education's legal duty to remedy past unconstitutional segregation:

Where there has been a history of state-imposed segregation of the schools, it is not sufficient to adopt a plan which, out of context, might be seen as nondiscriminatory but which does not do as much to disestablish segregation as an alternative proposal which is feasible and pedagogically sound. The School Board should be required to fulfill its affirmative duty to "eliminate the discriminatory effects of the past as well as bar like discrimination in the future." Green v. County School Bd. of New Kent County, *supra*, 391 U.S. [430], at 438 n. 4, 88 S.Ct. [1689], at 1694, [20 L. Ed.2d 716]; cf. United States v. Jef-

---

1. The following appears in Tennessee Code Annotated:

CHAPTER 37

Segregation Of Races

SECTION.

49–3701—49–3703. [Unconstitutional.]
*49–3701—49–3703.* [*Unconstitutional.*]
*Compiler's Note.* Under the decision of Roy v. Brittain (1956), 201 Tenn. 140, 297 S.W.2d 72, the statutes providing for the compulsory separation of races in the field of public education are no longer in effect, and therefore these sections have been omitted. They read:

*49–3701. Interracial schools prohibited.*—It shall be unlawful for any school, academy, college, or other place of learning to allow white and colored persons to attend the same school, academy, college, or other place of learning. [Acts 1901, ch. 7, § 1; Shan., § 6888a37; Code 1932, § 11395.]

*49–3702. Teaching of mixed classes prohibited.*—It shall be unlawful for any teacher, professor, or educator in any college, academy, or school of learning to allow the white and colored races to attend the same school, or for any teacher or educator, or other person to instruct or teach both the white and colored races in the same class, school, or college building, or in any other place or places of learning, or allow or permit the same to be done with their knowledge, consent, or procurement. [Acts 1901, ch. 7, § 2; Shan., § 6888a38; Code, § 11396.]

*49–3703. Penalty for violations.*—Any persons violating any of the provisions of this chapter, shall be guilty of a misdemeanor, and, upon conviction, shall be fined for each offense fifty dollars ($50.00), and imprisonment not less than thirty (30) days nor more than six (6) months. [Acts 1901, ch. 7, § 3; Shan., § 6888a39; mod. Code 1932, § 11397.]

ferson County Bd. of Educ., 372 F.2d 836, 869 (5th Cir. 1966), aff'd on rehearing en banc, 380 F.2d 385 (1967), cert. denied sub nom. Caddo Parish School Bd. v. United States, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967); Haney v. County Bd. of Educ. of Sevier County, 410 F.2d 920, 924–26 (8th Cir. 1969). Robinson v. Shelby County Board of Education, 442 F.2d 255, 258 (6th Cir. 1971). Accord, Harrington v. Colquitt County Board of Education, 460 F.2d 193 (5th Cir. 1972); see Davis v. School District of the City of Pontiac, 443 F.2d 573, 576–577 (6th Cir. 1971). The parties do not now question this standard but disagree about its application to the plan which the District Court has most recently ordered implemented.

Appellants contend that the plan has failed to desegregate the county's elementary schools, and one of its high schools; that their are alternative plans which are economically feasible and consistent with sound educational principles which would do more to eliminate the effects of past segregation; and that the plan unconstitutionally imposes a greater burden upon black students than upon white students because it requires the closing of all formerly black high schools and it requires the transporting of more black children than it does white children. The United States Department of Justice, which has intervened in this case, has addressed itself to more specific issues related to particular schools. In the District Court it introduced expert testimony and proposed alternative plans for the desegregation of four schools which, under the plan adopted by the District Court, have remained predominantly black: Harrold Elementary (63% black), Mt. Pisgah Elementary (93% black), Barret's Chapel Elementary (68% black), and Bolton High (70% black). Approximately 30% of the school children in the county are black.[2] Under the Government's suggested alternatives to the Board's plan, each of these schools would have been substantially desegregated during the 1971–72 school year. Appellants support the suggestions of the Justice Department.[3]

I

Three of the elementary school zone plans challenged by appellants are those of E. A. Harrold Elementary, Millington Central Elementary, and Millington South Elementary. In the same area, the school board has rented a recently closed parochial school building, St. Williams. Under the Board's plan, which the court adopted, Harrold was to have been operated with 381 fewer students than it could have accommodated, and 76% of its students would have been black. However, a fire in July 1971 in Millington Central required the transfer of some third- and fourth-grade students from that school to St. Williams and to Harrold. Because a majority of the pupils in the transferred classes were white, Harrold's over-all racial composition was thereby changed to approximately 63% black. However, the Board did not integrate the children transferred from Millington Central into classes already there. Instead, it housed the intact transferred classes within the transferee school, and the original Harrold classes therefore remained 76% black.

2. The adjectives "black" and "white" are inaccurate but understandable means of identifying the students to whom I refer. The terms "negroid" and "caucasoid" are technically more accurate in their description of people, but they are descriptive of groups which may include persons with physical characteristics usually associated with the other group, and I find it necessary here to make clear categorical distinctions. I will employ the words "Negro," "colored," and "black" interchangeably in this opinion.

3. The Justice Department's plan would have had the following effect upon the percentage of black students attending predominantly white elementary schools in the system:

|  | adopted plan | proposed plan |
|---|---|---|
| Raleigh-Egypt | 14% | 20% |
| Egypt | 4 | 31 |
| Millington East | 13 | 22 |
| Millington South | 6 | 18 |
| Coleman | 11 | 11 |
| Spring Hill | 13 | 13 |

The student body at Millington Central Elementary, located one mile south of Harrold, was left 80% white. The student body at Millington South Elementary, located about one and one-half miles south of Harrold, was left approximately 90% white.

The plan submitted by the Government suggested that Harrold be clustered with Millington Central and Millington South, and that Harrold and Millington South be used for grades one through five and Millington Central be used for grades six through eight. This plan, the Government asserted, would have facilitated an impending transfer of all grade six through eight students in this area to a new middle school which was under construction in the Millington area. In combination with the Government's suggestions for an adjacent area, Bolton—Barret's Chapel, this alternative would have made it unnecessary for the Board to lease St. Williams, and the use of the portable classrooms planned by the Board would have been reduced from eight units to two units.

At the hearing below, appellee's Superintendent of Schools agreed that adoption of the Government's plan would have made unnecessary the lease of St. Williams School. He also agreed that the Government's plan could have been implemented for the 1971–72 school year without waiting for the construction of the new middle school. Accordingly, this area would have been desegregated one year earlier than called for by the Board's plan.

On appeal, the Department of Justice asserts that the court did not abuse its discretion in approving the Board's plan, but that to permit the continued segregation of classes by race within Harrold is improper. Appellants maintain that the court's rejection of the Government's plan to cluster the three schools was also error.

I would hold that in refusing to adopt the Government's plan for this area for the 1971–72 school year, the court permitted the continuation of unconstitutional segregation. No reason appears why the plan should not have been implemented. No reason is suggested by the record. "Under explicit holdings of [the Supreme Court] the obligation of every school district is to terminate dual school systems at once and to operate now and hereafter only unitary schools." Alexander v. Holmes County Board of Education, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). The continuation of a constitutionally impermissible condition is not committed to the discretion of a court although the choice of remedies may be.

As the Government maintains, continued segregation within Harrold is impermissible. E. g., Johnson v. Jackson Parrish School Board, 423 F.2d 1055 (5th Cir. 1970). However, it is not clear that the District Judge was asked to consider this effect of the transfer of the displaced Millington Central students to Harrold, and it does not appear that he approved it. I assume that this situation will not be permitted to exist during the approaching school year.

An expert witness, Dr. Warren Buford, testified in support of the Government's plan. He stated that, in his opinion, the proposed opening of Harrold with 381 students fewer than its capacity would permit, and the rental of St. Williams in the same area, considered together, were an indication of Harrold's racial identifiability. This testimony was not commented upon by the District Court in his opinion, and I do not base my conclusion upon it. However, I observe that, if Dr. Buford was correct, the Board's plan not only failed adequately to desegregate the schools in this area, it had the effect of accentuating the racial identifiability of the black school.

II

A second attendance area challenged by appellants is that of Mt. Pisgah Elementary School. Mt. Pisgah is a formerly all-black school that was constructed to serve both elementary and secondary school children. When it was constructed in the late 1940's, it became the second school in the county to offer black children a high school education.

Its capacity was expanded during the mid-1960's under the Board's "freedom of choice" plan. It now will accommodate nearly 1200 students.

Under the Board's plan for 1971–72, which was approved by the court, Mt. Pisgah's high school students were transferred elsewhere, and it now serves children in grades one through eight. Ninety-four percent of these children are black. The plan also provides that two nearby elementary schools, Cordova and James, are to be closed for the 1972–73 school year and their 319 students transferred to Mt. Pisgah. Since the combined school population of Cordova and James is expected to be about 55% white, the transfer would slightly reduce the proportion of black students at Mt. Pisgah. The Board's plan additionally called for the construction of an elementary school on Whitten Road north of the Penal Farm, but the court refused to approve that construction.

The Government's alternative suggestion for Mt. Pisgah Elementary would have left it 53% white rather than 94% black. It would have required the closing of Cordova and James for the 1971–72 school year, since that would have aided desegregation and achieved a substantial saving of operating costs at those schools. Next, the Government would have transferred to Mt. Pisgah from the Whitten Road area 327 white students who are now bussed to Riverdale. Two hundred fifty black students who are now bussed to Mt. Pisgah would instead have been bussed to Elmore Park.

The District Court made no finding which supported the Board's decision to maintain Mt. Pisgah as a nearly all-black school. On this subject, the court merely stated:

> We further approve the Board's proposal to close the James (majority white) and Cordova (majority black) elementary schools before the 1972–73 year and to send the James pupils to Mt. Pisgah elementary and to divide the Cordova pupils between Mt. Pisgah and Riverdale-Germantown. How-

ever, though Mt. Pisgah will then serve a large rural area in which it sits at the center, it still will be predominately black. Accordingly, we believe the defendant Board should defer building an elementary school on Whitten Road, as it now proposes, to allow the Court to investigate further the placing of such school in such a location that it would aid in further desegregating Mt. Pisgah. This deferral is the recommendation of the Title IV Center.

330 F.Supp. at 846.

As the Supreme Court stated in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971):

> This district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools. No *per se* rule can adequately embrace all the difficulties of reconciling the competing interests involved; but in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition. Where the school authority's proposed plan for conversion from a dual to a unitary system contemplates the continued existence of some schools that are all or predominately of one race, they have the burden of showing that such school assignments are genuinely nondiscriminatory. The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.

Here the desegregation of Mt. Pisgah would have required the bussing of few children who are not already bussed. There is no apparent justification for the maintenance of this segregated

school, and it should be desegregated without unnecessary delay.

The court's decision not to permit construction of the Whitten Road school clearly was correct. The expert witnesses who testified about the proposed construction all recommended against the Board's suggestion for its location. Dr. Buford suggested that the effect of its construction would be to create a white enclave in the Whitten Road area and to insure the permanent segregation of Mt. Pisgah.

### III

The Government plan would also require changes in a cluster of schools now called the Shadowlawn cluster. In our May 1971 opinion in this case, we indicated that further action was required to desegregate Shadowlawn, which was being operated as a black elementary school. The Justice Department and consultants from a Title IV Center at the University of Tennessee had recommended the closing of nearby Ellendale Elementary, which had been operated as a well-integrated school serving a distinct community. That change alone would have left Shadowlawn 70% black.

The Board proposed that this single step be taken to desegregate Shadowlawn. Representatives of the Ellendale community intervened and argued for the maintenance of their community school. The court ordered Shadowlawn to be clustered with Elmore Park, Ellendale, Bartlett, and Raleigh-Bartlett Meadows Elementary Schools. Under that arrangement, Shadowlawn now serves grades seven and eight, and the other schools in the cluster serve grades one through six. Each of the schools is approximately 24% black.

Under the plan suggested by the Government after we remanded the case, Elmore Park would have been unavailable for the Shadowlawn cluster because it would have been used to desegregate Mt. Pisgah Elementary. Instead, the Government suggested, Shadowlawn could have been used to serve grades six through eight, and it could have been clustered with Egypt and Brownsville, which would have served grades one through five. Each of the three schools would have been 25% black. Elmore Park would have been 20–25% black.[4] Since it has not been included in the cluster, Egypt has remained heavily white (94%).

Appellants contend that the Government's plan for Shadowlawn should have been adopted because it would have made it possible to desegregate Mt. Pisgah and it would have desegregated Egypt Elementary. They also contend that two other nearby schools which remain nearly all white, Coleman and Spring Hill, should have been ordered desegregated.

The District Court made no findings about the propriety or necessity of leaving Egypt, Spring Hill, and Coleman predominantly white. Nevertheless, despite the presumption against schools disproportionately of one race (Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 402 U.S. at 26, 91 S.Ct. 1267), I would be reluctant to conclude on this record that the District Court abused its discretion in failing to desegregate these schools. In discussing the appropriateness of the cluster arrangement adopted, the court stated:

> We agree that such a cluster is the only way to desegregate Shadowlawn, and the problem becomes which schools should be included in the cluster with Shadowlawn. Certainly those relatively nearby elementary schools that are not shortly to be taken into the city must be included, because if this were not done, upon annexation Shadowlawn would be heavily black again. This means that Ellendale elementary, which is not to be annexed soon, and Bartlett elementary, which cannot be

---

4. A parent from the Ellendale community testified that Ellendale parents would prefer the Government's plan to the Board's plan because under the latter plan they (white students from Ellendale) would have been left in the "overwhelming minority."

annexed because it is in the incorporated town of Bartlett, must be included. The Elmore Park elementary zone is now the subject of litigation between Memphis and Bartlett as to which is entitled to annex the area; it should be included in the cluster since the litigation will in any event defer its annexation by Memphis and if Bartlett prevails, the defendant Board can continue Elmore Park in the cluster. Although the Raleigh-Bartlett Meadows and most of the Brownsville elementary school zones will be effectively annexed by Memphis in the summer of 1973, we see no reason why they should not be included in this cluster for the present.

. . . . . .

With respect to the Egypt, Scenic Hills, Spring Hill and Coleman zones as proposed by the defendant Board, all heavily white, the Title IV Center concurs. All of these except the Egypt zone are to be effectively annexed by Memphis by the summer of 1973 and the Egypt zone is under annexation study. The Department of Justice would have put Egypt in the cluster with Shadowlawn and would have left out Elmore Park (which it would treat by adding blacks from the "Bridgewater" area across the interstate highway from the Board's proposed Elmore Park zone).

I observe that my conclusions about the necessity of further action to desegregate Mt. Pisgah Elementary would likely change the District Court's conclusions about the necessity of including Egypt Elementary in the cluster with Shadowlawn; and it might be necessary to pair or cluster others of the predominantly white schools with predominantly black schools in order to complete the desegregation of this school system. Two recent Supreme Court decisions are pertinent to these considerations. In Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), the Court reversed a court of appeals decision and sustained a district court injunction prohibiting Em-

poria from separating its schools from the county school system of which it was a part. The district court had found that

the establishment of a separate school system by the city would constitute "an impermissible interference with and frustration of" its [previous] order . . . and preliminarily enjoined the respondents from taking "any action which would interfere in any manner whatsoever with the implementation of the Court's order heretofore entered. . . ."

Wright v. Council of City of Emporia, supra, 407 U.S. at 458, 92 S.Ct. at 2201. The Supreme Court stated that

[u]nder the principles of Green and Monroe, [Monroe v. Board of Commissioners etc., 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733] such a proposal must be judged according to whether it hinders or furthers the process of school desegregation. If the proposal would impede the dismantling of the dual system, then a district court, in the exercise of its remedial discretion, may enjoin it from being carried out.

. . . . . .

This "dominant purpose" test finds no precedent in our decisions. It is true that where an action by school authorities is motivated by a demonstrated discriminatory purpose, the existence of that purpose may add to the discriminatory effect of the action by intensifying the stigma of implied racial inferiority. And where a school board offers non-racial justifications for a plan that is less effective than other alternatives for dismantling a dual school system, a demonstrated racial purpose may be taken into consideration in determining the weight to be given to the proffered justification. Cf. Green, supra, 391 U.S. 430, at 439, 88 S.Ct. [1689 at 1694, 20 L. Ed.2d 716]. But as we said in Palmer v. Thompson, 403 U.S. 217, 225, 91 S.Ct. 1940, 1945, 29 L.Ed.2d 438, it "is difficult or impossible for any court to determine the 'sole' or 'dominant' motivation behind the choices

of a group of legislators," and the same may be said of the choices of a school board. In addition, an inquiry into the "dominant" motivation of school authorities is as irrelevant as it is fruitless. The mandate of *Brown II* was to desegregate schools, and we have said that "[t]he measure of any desegregation plan is its effectiveness." Davis v. Board of School Commissioners, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577. Thus, we have focused upon the effect—not the purpose or motivation—of a school board's action in determining whether it is a permissible method of dismantling a dual system. The existence of a permissible purpose cannot sustain an action that has an impermissible effect. *Id.* at 461, 92 S.Ct. at 2202. See United States v. Scotland Neck City Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972).

I further observe that the District Court has, during the pendency of this case, joined the City of Memphis School District as a party defendant for the limited purpose of pairing a city school with a county school to desegregate the county school. When the case was last before us, the District Court had rejected a Title IV Center proposal that two elementary schools, Coro Lake and White's Chapel, be paired. The result would have been that White's Chapel would have remained all black while Coro Lake would have been approximately 75% white. We indicated in our opinion and remand to the District Court that the two schools should have been paired. Thereafter, on motion of an intervening Coro Lake pupil, the District Court required the joinder of the City of Memphis for the purpose of considering the inclusion of Westwood Elementary, a city school, in the plan to desegregate White's Chapel. Some county residents had previously been sent to school at Westwood, which had been in the county system until it was annexed by the city. After a hearing, the court left Coro Lake as it was, and paired Westwood with White's Chapel. All three schools are now predominantly white. None of the parties has questioned the correctness of the court's ruling.

It further appears that the two school systems have cooperated in the matter of pupil attendance. An exhibit filed in the District Court on January 15, 1970, shows that it was the continuing policy of the Board of Education that county school children attending City schools as a result of annexation be allowed to continue at a city school although their home had not been annexed. It also disclosed that it was the Board's continuing policy that city children attending county schools should remain in those schools provided space was available.[5]

George Barnes, the County Superintendent of Schools, testified that it was likely that some accommodation of attendance zones and school placement between the city and county school districts could be worked out once it was determined what the court would require. He stated:

[W]e have no objection to keep[ing] city children. This has happened before when this area out east was annexed, . . . and we had no objection.

     .      .      .      .      .      .

There are possibilities in this particular thing that I think if we know what the Court tells us to do, then we would immediately seek to try to work with them.

For these reasons, and because I would have ordered the desegregation of Mt. Pisgah, the District Court should consider the inclusion of the remaining predominantly white elementary schools in a desegregation plan.

Appellants argue that all the remaining predominantly white schools must be desegregated. As the Supreme Court held in *Swann, supra,* there is

---

5. The county collects all the property taxes which finance the schools and transfers to the city its proportionate share of the revenue collected. In 1971, the city's share of county revenue was about 87%.

a presumption against schools that are substantially disproportionate in their racial composition. . . . The court should scrutinize such schools, and the burden upon the school authorities will be to satisfy the court that their racial composition is not the result of present or past discriminatory action on their part.

402 U.S. at 26, 91 S.Ct. at 1281. Upon reconsideration of this situation,

the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation.

Davis v. School Commissioners of Mobile County, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292 (1971).

## IV

Appellants also object to the attendance area established for Barret's Chapel Elementary School in the northwest area of the county. Until the past school year, Barret's Chapel served as an elementary and secondary school for black children. It was built in the middle 1960's when the district was operated under a "freedom of choice" plan. When actual desegregation of the county's schools began and the freedom of choice plan was abandoned, Barret's Chapel was paired with Bolton, which served white children in the same grades who lived in the same area.

During segregation, the schools were, in effect, paired to facilitate segregation by race. As a first step in their desegregation, it was natural that they should be paired, with earlier grades in one school and later grades in the other. The Board of Education predicted that this arrangement would result in student populations which would be 66% black in Bolton, attended by children in grades 7–12, and 62% black in Barret's Chapel, attended by children in grades 1–6. In fact, the proportion of black children in each school is higher than predicted.

The Justice Department suggested that an additional group of white children in grades 6–12 living in the area of the naval base immediately west of the Barret's-Bolton zone be added to the attendance area. Then, if one of the two schools were used for grades 9–12, and the other for grades 1–8, their racial composition would be 53% black and 55% white respectively. A smaller number of grade 1–5 children from the Barret's Chapel-Bolton area would have been transferred to Millington East Elementary. The net reduction of the number of students in the Millington area would have contributed to the Government's plan for that area which is discussed in Part I of this opinion. If that plan had been implemented, the Board would have found it unnecessary to lease St. Williams, and the number of portable classrooms needed in that area would have been reduced. However, the principal purpose of the Government's plan to transfer the students from Millington East was to further desegregate Barret's Chapel and Bolton, and thereby make it more likely that their populations would remain stable.

The Court approved the Board's plan for this area, and the result for the 1971–72 school year has been that Bolton's population is 70% black and Barret's Chapel's population is 68% black.

Dr. Buford was a proponent of the suggestion that the white students from Millington East be transferred to the Bolton and Barret's Chapel schools. He testified that the two schools were major problems because their high proportion of black pupils perpetuated racial identifiability there and made the retention of a white pupil population difficult. His prediction that the projected racial composition of their student bodies would overestimate the proportion of white students who would choose to attend those schools has proven correct.

The two Title IV Center experts who testified, Dr. Vindetti and Dr. Myer, agreed with Dr. Buford that the inclusion of the white Millington East children in the area would be feasible and consistent with sound educational policies, but they expressed no preference either for the Board's plan or for the Gov-

ernment's plan. School Superintendent George Barnes conceded that the westward extension of the schools' boundary would help desegregate the two schools and ease the problem caused by the fire at Millington Central. He also agreed that, in combination with the Government's suggestion for the Millington area, this would have made the lease of St. Williams unnecessary. Nevertheless, Mr. Barnes opposed the plan because it would require some additional bussing of Millington East students and because the Millington East students were the children of persons serving in the United States Navy at the naval station in that area. Mr. Barnes testified:

> I think your chances of succeeding is better than to bring in outside groups who are going to be unhappy, who are going to be belligerent to begin with. . . . I don't see how you could justify to those parents why their children are being moved eight or ten miles.

> [B]y far the big majority of these children are Navy connected. They are emotionally disturbed, many of them, when we get them. Their parents are as much so sometimes as the children are, and maybe sometimes the children adjust better than the parents do. . . .

> . . . . . .

> I think it might tend to upset the situation by bringing in strangers, foreigners, so to speak, who don't live in this area and don't know the people over there, and who would be belligerent, . . . and have the wrong attitude when they came there. . . . We have worked with these people out there.

It is not clear how much additional bussing would be required by the Government's plan.[6] Dr. Buford stated that relatively few children would have to be bussed who are not now bussed; but the children from Millington East would be bussed farther than they had previously been bussed. Mr. Barnes testified that, in his opinion, the Government's suggestion might require five additional busses. All the witnesses who were asked testifed that the plan was feasible.

In approving the Board's plan and in rejecting the Government's proposal, the District Court did not question the feasibility or educational soundness of the Government's plan. He concluded that further desegregation of these schools was unnecessary:

> It is the view of this Court that neither Barret's elementary school nor Bolton High School need be treated. We so conclude for the reason that substantially all of the evidence introduced in this case in the various proceedings supports the proposition that the contemplated racial composition of these schools would be the same if there had never been de jure school segregation applicable to the area they serve. Thus the racial composition of these schools cannot be said to be a vestige of state-imposed segregation. Even if, in determining whether these schools must be treated, we would be required to consider the use of some of the pupils in this area to treat surrounding schools, the answer is the same since we do not believe that the surrounding schools need be treated.

330 F.Supp. at 844.

I disagree with the District Court's conclusion for several reasons. First, as stated above, the Millington area adjoining this zone does require further desegregation; and the Government's plan for these schools would have complemented that action.

Second, the District Court's determination that "the contemplated racial composition of these schools would be the same if there had never been de jure school segregation of the area they serve" is not adequately supported by the record and, in this context, is irrele-

---

6. The United States naval base had, in prior years, provided up to six busses to accommodate the children of Navy personnel. It now appears, however, that naval base authorities have decided that no busses will be made available to the county after the 1971–72 school year.

vant. In making this determination, I am mindful of the presumption against the validity of school zones which fail to desegregate the schools within them. *Swann, supra,* 402 U.S. at 26, 91 S.Ct. 1267.

It is not denied that prior to the institution of this plan, these schools were unconstitutionally segregated. The fact that Barret's Chapel was built under a "freedom of choice" regime does not make its segregation constitutionally permissible, because the effect of its construction was to perpetuate racial patterns which had been established by law. Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Raney v. Board of Education of Gould School District, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Monroe v. Board of Commissioners of City of Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). The freedom of choice plan and the construction of Barret's Chapel did not contribute to the solution of the problems caused by segregation. As the Supreme Court has stated:

> The objective is to dismantle the dual school system. "Racially neutral" assignment plans proposed by school authorities to a district court may be inadequate; such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authorities present a district court with a "loaded game board," affirmative action in the form of remedial altering of attendance zones is proper to achieve truly nondiscriminatory assignments. In short, an assignment plan is not acceptable simply because it appears to be neutral.

*Swann, supra,* 402 U.S. at 28, 91 S.Ct. at 1282. The segregation which continued under the freedom of choice plan was itself the unconstitutional result of state action. In Monroe v. Board of Commissioners, *supra,* the Supreme Court held unconstitutional a "free transfer" plan, which the Court characterized as a variant of freedom of choice. It stated, at 391 U.S. 450, 459, 88 S.Ct. 1700, 1705, that

> if it cannot be shown that such a plan will further rather than delay conversion to a unitary, nonracial, nondiscriminatory school system, it must be held unacceptable. . . . [T]he Board, "must be required to formulate a new plan and, in light of other courses which appear open to the Board, . . . fashion steps which promise realistically to convert promptly to a system without a 'white' school and a 'Negro' school, but just schools."

These principles have recently been reviewed by the Supreme Court in Wright v. Council of the City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), where the Court stated that "[i]n *Green* . . . we decided that *any* plan is 'unacceptable' where it 'fails to provide meaningful assurance of prompt and effective disestablishment of a dual system. . . .'"

The interrelationship between the location and capacity of schools constructed in violation of the Constitution and the pattern of residential development around them involves so many and varied factors that a determination that a particular school attendance pattern would have evolved in that fashion if there had not been unlawful segregation is at best a surmise. This record contains testimony that the segregation of schools may affect population growth and housing patterns because the community tends to accommodate itself to existing public institutions.

The Supreme Court has recognized this relationship:

> The construction of new schools and the closing of old ones are two of the most important functions of local school authorities and also two of the most complex. They must decide questions of location and capacity in light of population growth, finances, land values, site availability, through an almost endless list of factors to be con-

sidered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching. People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods.

*Swann, supra*, 402 U.S. at 20–21, 91 S. Ct. at 1278. In the proceedings below, Dr. Buford testified as follows:

Q  . . . As I understood your position, schools do have an effect on where people choose to live and where people locate homes. . . .

A  I think this has been true in the past . . . .

Q  The testimony in this case is that the Board operated a freedom of choice plan for several years, some time after '65 up until I guess '69, perhaps '64, they operated freedom of choice, and during that time the Board spent ten to twelve million dollars in construction of new schools in addition to existing schools and that that construction program was carried out in a manner to accommodate the freedom of choice plan. In other words, the testimony is that the Board located the schools where they thought people would choose to attend school under the freedom of choice plan. Given those facts, what is your view of such a construction program in terms of its effect on desegregation of schools and neighborhoods? [7]

.  .  .  .  .  .

A. It has been my experience that, and here I make no specific reference to this school system, because I am not that familiar with the total history of school construction. But it has been my experience that where School Boards do construct new buildings under a freedom of choice plan that in so doing the population will be influenced to live in one neighborhood or another.

In his remarks from the bench, at various times, and less explicitly in his opinion, the District Judge indicated his observation that this rural area of the county has historically been inhabited predominantly by Negroes. Accordingly, he concluded that the racial composition of these schools "would be the same if there had never been de jure school segregation applicable to the area they serve." 330 F.Supp. at 844. However, there is no evidence that these schools would be the same size or in the same location had there been no unconstitutional segregation.

Possibly, by the introduction of evidence establishing that there remain no residual effects of unconstitutional segregation, the School Board could overcome the presumption against the validity of school zones with pupils of predominantly one race. But when, as here, there is a sound alternative plan which would further desegregate the schools, the burden is indeed a heavy one. The evidence of record falls short of sustaining that burden.

This is not to say that, once unconstitutional segregation has been found, there may never be schools with substantially disproportionate racial populations. However, once unconstitutional segregation has been found, every effort, taking into account the practicalities of the situation, should be made to accomplish the full desegregation of an unconstitutionally segregated school sys-

7. Superintendent of Schools Barnes had testified that the Board had spent about one to two million dollars each year on school construction during the years of freedom of choice, and that the total spent was about ten to twelve million dollars.

tem. Davis v. Board of School Commissioners, *supra*, 402 U.S. at 37, 91 S. Ct. 1289; Kelley v. Metropolitan Board of Education of Nashville and Davidson County, 463 F.2d 732, 744 (6th Cir. 1972).

## V

Appellants also contend that the court erred by permitting the School Board to adopt a plan which imposes a greater burden upon black students than upon white students without justifying the imposition by objective standards. They assert that the Board's plan impermissibly burdens black students because it has closed Barret's Chapel and Mt. Pisgah as high schools, although both should have been maintained as high schools. The result has been that all formerly black high schools in the school district have either been closed or converted to elementary schools. They also assert that the Court's plan for desegregating Shadowlawn placed too great a burden upon black children because it left only two grades in that formerly black school rather than three grades.

Any purposeful imposition of a disproportionate share of the desegregation burden upon black students is impermissible, unless there are compelling circumstances justifying that imposition:

Closing schools for racial reasons would be unconstitutional. The equal protection clause of the fourteenth amendment prevents any invidious discrimination on the basis of race. Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. A governmental unit bears a "very heavy burden of justification" to support any use of racial distinctions. Loving v. Commonwealth of Virginia, 1967, 388 U.S. 1, 9, 87 S.Ct. 1817, 18 L.Ed.2d 1010. Under general equal protection doctrine, therefore, it would be impermissible for the school board to close formerly black schools for racial reasons. More particularly, such action is prohibited by the school desegregation cases. *Brown II, supra,* [349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083,] calling for "a racially nondiscriminatory school system," and its progeny require not only that past discriminatory practices be overcome by affirmative actions but also that new forms of discrimination not be set up in their place. Closing formerly black school facilities for racial reasons would be such a prohibited form of discrimination. "Such a plan places the burden of desegregation upon one racial group." Brice v. Landis, N.D.Cal.1969, 314 F.Supp. 974. See Quarles v. Oxford Municipal Separate School District, N.D.Miss. January 7, 1970, C.A.W.C. 6962–K.

Lee v. Macon County Board of Educ., 448 F.2d 746, 753–754 (5th Cir. 1971) (footnote omitted). *Accord,* Kelley v. Metropolitan Board of Educ., *supra,* 463 F.2d at 751 (concurring opinion); Mims v. Duval County School Board, 447 F.2d 1330, 1331 (5th Cir. 1971).

Here the problems facing the District Court are complex. It is true that, in desegregating Shadowlawn, the court could have adopted a plan which would have lessened the burden upon black children without lessening the effectiveness of the desegregation plan. However, on close examination, the decision to operate Shadowlawn as a two-grade school instead of a three-grade school has no sinister implications and appears to be an effective means of desegregating that school. Therefore, I would approve the plan for Shadowlawn without prejudice to reconsideration by the court in the light of our observations about the possibility of amending the cluster to facilitate the further desegregation of Mt. Pisgah.

Appellants' contentions about the effects of the closing of all the formerly black high schools in the county, and their specific objections to the closing of Mt. Pisgah High and Barret's Chapel High are more subtle and difficult to meet. An understanding of their thrust requires a brief review of the development of black high schools in the school system.

In the first 50 years after the Supreme Court's decision of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L. Ed. 256 (1896), which validated separate but equal public facilities, there existed only one high school in the Shelby County school system (Woodstock) which Negro children could attend. And that facility was financed in part by a private foundation. It was located in the northwest part of the county and was so remote from other areas that many children who wished to attend were required to remain overnight. No public financial aid or public transportation was provided for black students who wished to attend it; but dormitory space, furnished by private charity, was available there for those who could find their own transportation and wished to stay through the week. The second high school facility constructed for Negroes, Mt. Pisgah, was built during the late 1940's. Later, under the Board's freedom of choice plan, it was substantially enlarged. Before the construction of Mt. Pisgah, Collierville, which was a ten-grade black school, and Woodstock were the only public facilities in Shelby County for the education of Negroes beyond the primary grades. Education for black children was afforded principally in approximately 170 one-, two-, or three-room schools which provided no more than an eighth-grade education. No bus transportation was provided for black children until after the construction of Mt. Pisgah following World War II.

Although the record does not provide a complete history of the development of public schools for black children in the system, it indicates that by 1970, Mt. Pisgah had been expanded to accommodate nearly 1200 elementary and secondary students. However, its curriculum was not on a par with that offered at high schools attended by white children in the system. Dr. Buford, testifying in 1971 from a document provided by the Board of Education, compared the curriculum at Mt. Pisgah High with that at Millington Central High as follows:

| Millington Central | Mt. Pisgah |
| --- | --- |
| Art I–IV | Art I |
| Chorus | |
| Speech I & II | Speech I |
| Latin—3 years | French I |
| French—3 years | |
| Spanish—3 years | |
| General Shop I | General Shop I & II |
| Arithmetic | Arithmetic |
| Algebra—2 years | Algebra I & II |
| Unified Geometry | Unified Geometry |
| Advanced Math. | Advanced Math. |
| Applied Math. | Applied Math. |
| Calculus | |
| Biology I | Biology I |
| Chemistry | Chemistry |
| Physics | Physics |
| General Science | |
| World History | World History |
| American Studies | American History |
| Geography | Civics |
| History | |
| Economics | |
| Contemporary Problems | |
| Automobile Mechanics I & II | |
| Distributive Education I & II | |
| Home Economics I, II & III | |

In the District Court, appellants argued that the black community considers high schools more symbolically significant than elementary schools and, accordingly, that the closing of all the black high schools had an especially strong emotional impact on the community. Appellants have not pressed this argument on appeal, and have confined their arguments to the following: the result of closing all the black high schools has been the unjustified imposition of a relatively greater transportation burden upon black students; and the systematic closing of all the black high schools amounts to an unconstitutional racial classification of those buildings.

The record provides no support for the first of these contentions. In only two instances, Mt. Pisgah and Barret's Chapel, do appellants contend that the closing of black high schools was not justified by objective educational considerations. Since Barret's Chapel is now being operated as an elementary school at approximately its previous occupancy level, it does not appear that changing it back to a high school would, in itself, change the number of black students who must be transported. With regard to Mt. Pisgah, the record is less clear. But it appears that substantially all its

former high school students were transported to school before its closing. Its reopening would therefore not substantially affect the transportation burden upon those students.

There is support, however, for the proposition that the pattern of closing black high schools indicates a racial classification. In a colloquy with the court, Dr. Buford testified as follows with regard to his recommendation that Barret's Chapel be maintained as a high school:

THE WITNESS: And at the same time we were aware that all of the formerly all black schools, high schools, had been discontinued, and when it comes to the matter—it's very difficult—it was very difficult for me personally in trying to arrive at a legal solution to this, and I have to take into consideration racial identifiability in schools. I also have to take into consideration, say, stability, both now and in the future. It was of concern to me that the last formerly black secondary school was being done away with, so to speak, when in my view it was a perfectly adequate, albeit, excellent facility for secondary school pupils, and it was my view that—

THE COURT: (Interposing) Would you consider that point of constitutional significance with the guidelines that have been given you by the Department of Justice lawyers investigating this situation?

THE WITNESS: Well, I make the bridge here. I make the relationship on this question of racial identifiability.

THE COURT: Well, on that point did you consider it to be less racially identifiable to put the high school in Barret's Chapel and the elementary school in Bolton? . . .

THE WITNESS: Well, two factors, your Honor—I felt that, here again, this would be placing the burden on the blacks to give us their last secondary school.

THE COURT: Well, do you have any evidence that the blacks really care about that as long as they are integrated and go into an adequate plant?

THE WITNESS: Yes, sir, I do.

THE COURT: You feel that?

THE WITNESS: Yes, sir.

THE COURT: Did you talk to any of them out there?

THE WITNESS: Yes, sir.

THE COURT: That's what they want?

THE WITNESS: Yes, sir. . . .

In his testimony, Dr. Myer, the court's expert witness, testified upon cross-examination by appellants' counsel as follows:

Q Dr. Myer, we have in Shelby County a system which in the very recent past and within its present boundaries operated six or seven black high schools. Within this past year the system operated two black high schools, and this year they propose to operate no black high schools.

Does that accord with your knowledge of the system?

A . . . Yes, sir.

. . . . . .

Q Is it also your understanding that all of the black high school students from those schools have been assigned to formerly white high schools?

A Yes, sir.

. . . . . .

Q (Interposing) Is there anything about the fact that this system has done that that bothers you as an educator and as a person involved in desegregation planning?

A Yes, sir, there is.

Q What is that?

A The feeling of fairness involved. I feel that all things otherwise being reasonably equal, then the black high school, the formerly black high school, . . . should be retained, at least in certain cases. But I still feel, Mr. Caldwell, that in spite that professional personal feeling that the School Board's responsibility—it's the

School Board's responsibility to make that decision.

.    .    .    .    .    .

Q   You would not consider the fact that black students have borne the burden of desegregation to have any adverse effect on their perceptions of the desegregation process?

A   I didn't say that, because I do believe there are some adverse effects, yes.

.    .    .    .    .    .

Q   Would you agree with me that the fact that I have just outlined to you with the closing of black high schools treat black people differently than it does white people?

A   Yes, sir.

Superintendent of Schools Barnes testified about this point on cross-examination as follows:

Q   You recall when the Title IV Center recommended last year that Barret's Chapel be made the high school?

A   Yes, sir.

Q   And you disagreed with that?

A   Yes, sir.

Q   And what is your reason?

A   Because the two communities disagreed with it, and I thought they had a right to because both of them have been there a long time. They have traditional backgrounds there, and there were deep loyalties, and it is a pretty big thing the first year to upturn a twelfth grade or eleventh grade group, and by the Court allowing the twelfth grade to stay there one year, now I think everybody understands that this is going to happen the second year, and it is much easier to do it now than it would have been last year. The children were prepared for graduation and had bought class rings and all that, and I don't believe in telling them their high school is done away with, and we kept it open a year and came back after everyone understood the problem and have combined them.

At a later point in the proceedings below, the District Judge indicated his own familiarity with the county's history by his questioning of Assistant Superintendent Wells, who had been called as a witness by appellants. Mr. Wells had been employed by the Shelby County school system for thirty-eight years.

THE COURT: You have been familiar with the Barret's Chapel School a long time.

THE WITNESS: Yes, sir.

THE COURT: How long was Professor Hoffman running that school?

THE WITNESS: He was there, sir, when I started.

THE COURT: And when did he leave?

THE WITNESS: About three years ago.

THE COURT: Was Professor Hoffman active in politics out that way?

THE WITNESS: Yes, sir.

THE COURT: Didn't he used to get blacks in from the whole area and vote them out there at Stewartville?

THE WITNESS: Yes, sir.

THE COURT: And they didn't have too much choice about how they voted in those days, did they?

THE WITNESS: No, sir.

THE COURT: Are you telling me there is all this sentiment about Barret's Chapel School with all this background, that Barret's Chapel is a symbol of black independence and all that as Mr. Caldwell is trying to convince this Court?

THE WITNESS: I haven't said that, sir.

THE COURT: Well, is it?

THE WITNESS: Seemingly, Judge, we haven't had too much kickback through the Barret's area. I don't think we have now. I haven't heard too much about it.

In his memorandum opinion, the District Court disposed of appellants' arguments in three footnote comments, 330 F.Supp. at 843 n. 8, 844 n. 10, 847 n. 15:

8.  The NAACP also contends that, contrary to the Board's plan, Mt. Pisgah, histori-

cally a black high school and still heavily black, should not be closed and the pupils transferred to schools wherein the ratio of whites to blacks would be substantially higher. The Board desires to do this, it contends, because Mt. Pisgah high school student body is too small and remains nearly all black. The NAACP contends that Mt. Pisgah should be kept open, and whites transferred to it, because of the burden on the black pupils of transferring and because of their emotional attachment to this black high school.

．　　　．　　　．　　　．　　　．

10. The Department also would make Barret's, rather than Bolton, the high school for the reason that, it contends, it is a superior facility to Bolton for this purpose, with which the NAACP agrees. The Title IV Center believes there is no real choice between the schools for this purpose. The NAACP also contends that Barret's should be the high school because high schools have more standing in the public eye than do elementary schools and that therefore Barret's, as the last remaining formerly black high school, is an emotional symbol to blacks. These, we believe, are not constitutional considerations.

．　　　．　　　．　　　．　　　．

15. At the same time, as has been seen, the NAACP has made arguments for maintaining Mt. Pisgah as a high school and for making Barret's, rather than Bolton, a high school which amount to the proposition that some schools should be retained because of their black identity. Actually, one of the great practical problems in desegregation is getting whites who are assigned to schools that have, merely because of their very names or for other reasons, a black identity, to stay there.

The Court did not address itself to the issue as it has been framed in this court: whether the pattern of closing of all black high schools in the system is indicative of an impermissible racial classification employed by the Board in determining which high schools to maintain. This is a mixed question of fact and law which we cannot adequately resolve on the record before us, without the aid of findings by the District Court.

It appears that the decision to close Mt. Pisgah High School may be supportable by reference to objective factors. All the evidence indicates, however, that Barret's Chapel is a better high school facility than is Bolton. Barret's Chapel has superior high school athletic facilities, whereas Bolton has facilities better suited to elementary recreation than are Barret's Chapel's. Dr. Buford determined "with no question" that Barret's Chapel is the better high school facility. Although the Title IV Center experts who testified below indicated that there is no substantial difference between the two facilities, the Title IV Center had, at first, recommended that Barret's Chapel be retained as the high school. Accordingly, I would remand this issue concerning Barret's Chapel and Mt. Pisgah High Schools for appropriate findings of fact and conclusions of law.

## VI

The District Court made no findings about the additional cost which would have been incurred by the Board if it had been ordered to implement the Government's plan. He stated:

There is no question but that the plan proposed by the Department would come closer than the Board's plan, as amended by the suggestions of the Title IV Center, to creating a racial ratio in each school that approximates the ratio in the system as a whole. It is also clear that the Department's plan would require substantially more busing, though it is not clear as to how much more would be necessary. It is further clear that the additional buses could not be obtained for the coming year because they are generally unavailable and that to carry out the Department's plan at this time it would be necessary to stagger the daily starting times of the schools.

330 F.Supp. at 843.

The history of bussing in this school district indicates that the school administration could easily have accommodated the additional bussing which would have been required by the Government's plan. Dr. Buford testified that the Government's plan might have cost no more than the Board's plan because he proposed closing Cordova and James Elementary schools one year earlier than the

Board had planned, and he assumed that busses now in service could be used to make additional runs each day. Mr. Barnes testified that the additional bussing could cost more than two million dollars.

As did the District Court, I assume that the actual cost would be significant, but I observe that no portion of the Government's plan was inordinately expensive, and no part of it was considered unfeasible by the experts who testified in this case. Dr. Buford testified that the Government plan would require the bussing of 1100 additional elementary school children. The extent of present and past bussing in this system indicates that this additional burden could easily be borne.

During the 1970–71 school year, the Board operated over 150 busses and bussed 14,600 children. In earlier years, the system required considerably more bussing. During the 1963–64 school year, the county operated approximately 144 busses and bussed 20,408 children. The changes in the magnitude of the county's bussing effort may be seen in the following table: [8]

| Year | Busses | Students Bussed |
|------|--------|-----------------|
| 1963–64 | 144 | 20,408 |
| 1964–65 | 147 | 20,507 |
| 1965–66 | 155 | 20,209 |
| 1966–67 | 155 | 19,629 |
| 1967–68 | 160 | 18,992 |
| 1968–69 | 145 | 17,900 |
| 1969–70 | 167 | 16,918 |
| 1970–71 | 167 | 14,600 |

The number of children bussed has been lowered by the construction of new schools in outlying areas and by the city's annexation of relatively densely populated areas. At the same time, the number of busses employed has remained relatively high. This has permitted their operation on a two runs per day basis, whereas a substantial number of busses was once employed for three runs per day.

A statement by the Supreme Court in *Swann, supra,* 402 U.S. at 29–30, 91 S.Ct. at 1282–1283, is applicable here:

> Bus transportation has been an integral part of the public education system for years, and was perhaps the single most important factor in the transition from the one-room schoolhouse to the consolidated school. Eighteen million of the Nation's public school children, approximately 39% were transported to their schools by bus in 1969–1970 in all parts of the country.

The importance of bus transportation as a normal and accepted tool of educational policy is readily discernible in this and the companion case *Davis, supra.* The Charlotte school authorities did not purport to assign students on the basis of geographically drawn zones until 1965 and then they allowed almost unlimited transfer privileges. The District Court's conclusion that assignment of children to the school nearest their home serving their grade would not produce an effective dismantling of the dual system is supported by the record. [Footnote omitted.]

## VII

This case should be remanded to the District Court for further proceedings in accordance with this opinion. I am well aware of the complexities of the problems faced by the able District Judge who is required by the law of the land to extirpate now the effects of practices and policies pursued for generations. I am also aware that another school year is commencing and I would not direct that the opening of classes be delayed. However, I believe it is his task to reevaluate the status of the schools and the attendance areas I have discussed and to order the further desegregation of this school system at the earliest practicable time until it is completed in accordance with the principles stated herein.

---

8. The figures which indicate the number of busses employed actually state the numbers of the highest-numbered bus in the system each year. In 1970–71, the highest numbered bus was number 167, but the system actually operated 153 busses.