**Michael and Cynthia PRIDE, minors, by their mother and next friend Bulena Pride, et al., Plaintiffs-Appellants,**

v.

**The COMMUNITY SCHOOL BOARD OF BROOKLYN, NEW YORK SCHOOL DISTRICT #18, et al., Defendants-Appellees.**

No. 637, Docket 72–2371.

United States Court of Appeals, Second Circuit.

Argued March 7, 1973.

Decided June 18, 1973.

James I. Meyersohn and Nathaniel R. Jones, N. A. A. C. P., New York City (I. Frederick Shotkin and Delson & Gordon, New York City, on the brief), for plaintiffs-appellants.

Alfred Weinstein, New York City (Norman Redlich, Corp. Counsel of the City of New York, and Stanley Buchsbaum, New York City, on the brief), for defendants-appellees.

Before LUMBARD, HAYS and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

This appeal is from the denial of a motion for a preliminary injunction sought by a group of parents of black and other non-white children residing in Tilden Houses, a public housing development in Brooklyn, on behalf of themselves and others similarly situated, to require the Community School Board for District No. 18 to assign their children to schools within the district in accordance with past practice.

After a two day hearing in the Eastern District of New York, Jacob Mishler, *Chief Judge,* an order was entered on November 13, 1972 (1) finding no likelihood of success on the equal protection claims raised; (2) finding no irreparable harm from the denial of the preliminary injunction; and (3) refusing to rule on the alleged violations of local administrative procedure.

Under the applicable standards for review of the denial of a motion for a preliminary injunction, and under the rules for refusal of pendent jurisdiction, we affirm.

I.

BACKGROUND FACTS

In view of the importance of the facts to the resolution of this controversy and in view of our limited scope of review of the district court's findings of fact which are not clearly erroneous, Fed.R. Civ.P. 52(a), we shall summarize here the controlling facts that provide the underpinning for the district court's conclusions of law which we affirm.

The center of the instant controversy is an eight-building public housing complex known as Tilden Houses, located in the predominantly black Brownsville section of Brooklyn. During the period from at least 1958 until 1971, the school-aged children residing in Tilden Houses were assigned to one of five public elementary schools in the nearby, predominantly white, Canarsie section of Brooklyn. The specific assignment depended on the address of the Tilden Houses building where the child lived. During that period, under the New York Education Law, the City Board of Education was responsible for the school assignments of New York City children.

In 1969, the New York City School Decentralization Law (Article 52–A) was enacted. Ch. 330, § 4 [1969] N.Y. Laws, N.Y. Education Law, art. 52–A, § 2590 et seq. (1970). Under that statute, the great bulk of the authority for management of the City's pre-kindergarten, nursery, kindergarten, elementary, intermediate and junior high schools was allocated to the various community school districts to be established pursuant to § 2590–b(2) of Article 52–A. Included therein is the general power to "manage and operate the schools and other facilities under [a district's] jurisdiction," § 2590–e(4), which presumably

contains the authority to assign students to particular schools within the district.

The resulting district lines placed the five schools to which Tilden Houses children formerly had been assigned in Canarsie's Community School District No. 18 (District 18).[1] Accordingly, a number of parents of Tilden Houses children scheduled to enter school in 1971 registered their children at the schools to which residents of their specific buildings formerly had been assigned. On May 24, 1971, however, District 18 entered into an agreement with Brownsville's Community School District No. 23 (District 23), the geographical boundaries of which included Tilden Houses, whereby Tilden Houses were to be zoned into District 23 for the school year beginning September 1971.[2] This agreement purportedly was effected in compliance with procedures established on March 10, 1971 by the Office of the Deputy Chancellor of the City school system in a document known as Special Circular No. 58.[3]

1. The City Board of Education map entitled "Utilization of School Buildings and Data on large-scale Housing (as of October 29, 1971)", received in evidence as Defendant's Exhibit A, shows all of the Tilden Houses to be within the borders of District 23 rather than District 18. The record does not disclose either the origin of the practice of assigning Tilden Houses children to schools in what is now District 18, or the authority for continuing to do so subsequent to decentralization.

2. As outlined in a letter to Deputy Chancellor Percell from Deputy Superintendent David Marcus of District 23, the agreement was as follows:

"Tilden Houses—Rockaway to Stone
 Avenues
 Dumont to Livonia
 Avenues
to be zoned into District 23 for Elementary and Jr. H.S. for school year commencing September 1971."

The letter was co-signed by Samuel D. Wright, President of Community School Board 23, and by two officials of District 18, Max Meyers (then the Community Superintendent) and Jack Zimmer (President of the Community School Board).

3. Special Circular No. 58 states in pertinent part:

"ZONING PROCEDURES FOR ELEMENTARY, INTERMEDIATE AND JUNIOR HIGH SCHOOLS

1. The decision as to whether a new school building is intended to serve the children of one district or more than one district shall be made by the Chancellor.

2. In the zoning of schools under their jurisdiction, community school boards shall be subject to applicable Federal laws and State laws and administrative policies.

3. All proposed *intra-district* zoning changes, by the community superintendent and the community school board, including those related to the opening of new schools, shall be reviewed by the Central Zoning Unit for the Chancellor. These changes in the form of proposals should be forwarded no later than March 1 of each school year. The Central Zoning Unit shall act within ten days, if it recommends disapproval of the proposal, and set forth its objections based on policy, apprising the district of the reasons. The district shall have a reasonable time in which to review, revise or oppose the recommendations of the Central Zoning Unit, or to request a hearing before the decision of the Chancellor is made. Requests for consideration of changes in existing zone lines may also be made by parents or community groups to the community school board(s) concerned.

4. For all *inter-district* zoning changes, plans or changes involving the zoning of new schools, the re-zoning of existing schools, proposals for the relief of overcrowding or for improved integration, etc., the community school board seeking the change should first obtain the approval of the other community school board(s) affected or from whom relief or assistance is requested. In the case of zoning of new schools affecting more than one district, the community school board in which the new school is located shall have the responsibility of initiating the necessary consultation.

Proposed zoning changes should be sent to the Office of the Deputy Chancellor not later than October 1 for a February opening and not later than January 1 for an opening scheduled for September of the following school term. The proposed zoning or re-zoning shall be in accord with city-wide policies concerning the use of space. If after mutu-

Word of this agreement led Mrs. Joan Boatright, a Tilden Houses resident, to check with the Central Zoning Unit, referred to in Circular No. 58, as to the proper school district for registration of Tilden Houses children. Mrs. Boatright was given a letter advising her of the procedures for inter-district zoning proposals, including the need for recommendation by the Central Zoning Unit. A handwritten postscript beneath the signature of John Dudley of the Central Zoning Unit [4] read as follows: "The agreement for rezoning of the Tilden Houses were not plans recommended by the Central Zoning Unit." Relying on this and other assurances, several Tilden Houses mothers who, prior to the inter-district agreement, had registered their children for kindergarten in P.S. 244,[5] reported at that school on the first day of the school year beginning September 1971. Despite the unquestioned validity of those registrations, District 18 refused to enroll the children, basing its action entirely on the agreement with District 23. As a result, no kindergarten children from Tilden Houses were enrolled in any District 18 schools for the school year beginning September 1971, with the exception of a limited number granted admission because of the attendance of siblings. The parents were assured, however, of admission in the following year.

The controversy predictably came to a head as the September 1972 school year approached. The position of District 18 continued to be that, while Tilden Houses children already attending schools within the district might continue to do so, no new Tilden Houses children would be allowed to enroll in District 18 schools. Several Tilden Houses parents nevertheless insisted that their children had a legal right to attend District 18 schools, and that such right had been acknowledged the previous year by District 18 officials. An inquiry at the Office of the Deputy Chancellor by Rev. Wilbert B. Miller, a leader of the Tilden Houses parents group, indicated strong support by the City Board for the parents' position. In a letter dated July 6, 1972 from Assistant Superintendent of Schools Henrietta B. Percell to Reverend

---

al discussion the two districts fail to reach agreement, the matter should be appealed to the Office of the Chancellor, attention of the Deputy Chancellor, forwarding at the same time, supporting correspondence and data. The Chancellor shall have the power to require such changes as are necessary and desirable. The Chancellor's decision shall be forwarded no later than December 1 for a February opening and March 1 for a September opening.

5. The Central Zoning Unit and Office of School Buildings will provide the districts concerned with the necessary data required for planning.

6. In all zoning matters community school boards shall consult with parent groups affected by the proposals.

7. The Chancellor may request from each community school board such data as may be necessary.

8. The Chancellor shall maintain current maps of district boundary lines and school zone lines, which shall be open to public inspection.

9. Where zoning proposals agreed upon by the community superintendent and the community school board involve transportation, they shall be reviewed by the Transportation Committee and recommendations made to the Chancellor for his decision.

10. In every case where the Chancellor makes a decision concerning schools under the jurisdiction of the community school boards, they shall have a right of appeal in accordance with Section 2590-g(10) and Section 2590-l of the Decentralization Law."

4. Mrs. Boatright testified that the handwritten addendum was already affixed to the letter at the time it was handed to her.

5. For purposes of focusing on the issues, the instant dispute will be treated as principally involving P.S. 244. In fact, two of the named plaintiffs registered their children at District 18's P.S. 235 and P.S. 233, respectively. At the 1972 registration conducted by Assistant Superintendent Schreiber (discussed *infra*), some children also were registered at P.S. 135 and P.S. 268. Those five schools constituted the places of attendance of Tilden Houses children in the pre-decentralization years.

Miller, the City Board's stance was stated in part as follows:

"[T]he Deputy Chancellor on his own behalf and that of the Chancellor, wrote to Community School Board 18 informing them of their responsibility to register and assign the pupils from the Tilden Houses. As of this date, we have received no assurances that these directives will be implemented.

Therefore, let me assure you that this office will take all necessary steps to effectuate compliance with the Chancellor's directive. The schools are presently closed for the summer and certain difficulties are thereby presented, nevertheless, we will proceed towards enforcing what we see as our legal responsibility."

On August 14, a letter from Deputy Chancellor Irving Anker to Reverend Miller further assured the right of the Tilden Houses children to attend their zoned schools, and stated that "[i]f there are any children denied admission to their zoned schools, they have a right to notify this office and to appeal to this office if appeals to Community School Board 18 are ineffective."

District 18 nevertheless remained rigid. Therefore, on September 8, 1972 (three days before the scheduled opening of school), Deputy Chancellor Anker, on behalf of the Chancellor, issued an order placing District 18 in trusteeship, pursuant to § 2590–l(1)(a) of Article 52–A. Assistant Superintendent Daniel Schreiber was appointed trustee "for the purpose of ensuring compliance with the instructions previously issued by this office with regard to the registration of the students from the Tilden Houses."

On September 11, Assistant Superintendent Schreiber went to District 18's Junior High School 285 to determine whether the district was prepared to recognize his authority as trustee.[6] The doors to the school were closed. The following day, Schreiber and his aides went to P.S. 244, where he knew the Tilden Houses parents had gathered. There he found general intransigence on the part of the principal and employees of the school, and a sit-in by the Canarsie parents. He directed the Tilden Houses parents to move into the school's auditorium for the purpose of registering the children. The forms distributed to the parents, while differing to some extent from those normally used for registration, requested the same essential information as the official forms. The next problem was to assign the children to particular schools within the district. Schreiber, being unfamiliar with past practice in that regard, asked the parents to indicate on the child's registration form the school to which he would have been assigned under the pre-decentralization policy of assignment based on address. This was meant to insure compliance with the trusteeship instructions to register the children for District 18 schools as in past years. He then instructed the parents to report with their children on Wednesday, September 13, to the schools they had indicated.

On September 13, the District 18 schools were closed by order of the Community School Board. Schreiber returned to P.S. 244 where most of the Tilden Houses parents were again assembled, and gave them new registration forms to complete, this time identical to those normally used. Schreiber's aids

6. Throughout this period District 18 was also engaged in an ongoing dispute concerning the assignment of junior high school students from Tilden Houses. Indeed, according to the testimony of Assistant Superintendent Schreiber, it was District 18 Acting Community Superintendent Garner's direction not to register any Tilden Houses children in Junior High School 285 which provided the immediate impetus for the placing of District 18 in trusteeship. Late in the day on September 11, however, District 18 agreed to follow the mandate of the central authorities with respect to the placement of junior high school students. Assistant Superintendent Schreiber immediately abandoned his trusteeship over the district's junior high schools. From that point on, the trusteeship was limited to the elementary schools.

performed a like function at the other District 18 elementary schools. The completed forms were then delivered to the District 18 Community School Board for the purpose of assigning children to specific schools.

Shortly thereafter, District 18 decided to retreat to some degree from its earlier position. The Community School Board Superintendent Harvey Garner notified the Tilden Houses parents who had registered their children on September 12 and 13 that the children would be accepted for enrollment in District 18. The children, however, would not be assigned in accordance with past practice (i.e. to one of five schools, depending on the building occupied), but rather *all* would be assigned to P.S. 135. Word of this decision reached the office of the Deputy Chancellor, resulting in a letter dated September 15 from Deputy Chancellor Anker to Acting Superintendent Garner and Mr. Jack Zimmer, the President of the District 18 Community School Board. That letter set out Special Circular No. 58's procedures for intra-district zoning changes and asked the two named officials to "submit the proposed intra-district zoning changes to the Chancellor and the Central Zoning Unit as quickly as possible."

On September 19, Mr. Zimmer responded on behalf of District 18 as follows:

"Dear Mr. Anker:

After a careful study of the utilization figures of all the elementary schools in District 18, Community School Board District 18 reached a unanimous conclusion that all Tilden Houses youngsters in grade one will be placed in P.S. 135, 684 Linden Blvd. pending a decision of the appeal from Community School Board District 18 to the Central Board of Education, for the following reasons:

1. It is the only school which at present has available seats.

2. We believe that it is educationally sound for Tilden Houses youngsters to be picked up by bus and brought to one school for their educational experience rather than being distributed throughout the District.

3. The lunchroom facilities are adequate.

4. Tilden Houses children have been received by this school in the past so that this will not create any radical change.

Once again we ask you to bear in mind that this proposal is in no way to prejudice our appeal which is currently before the Central Board of Education.

Very truly yours,

/s/ JACK ZIMMER

Jack Zimmer
President
Community School Board
District 18" [7]

This proposal was approved by the Central Zoning Unit without comment.[8] It is to that zoning change that the instant motion for preliminary injunction was directed. As the district court observed, the question for decision was considerably narrower than the complaint on the merits (which raised issues of integration levels throughout the district) would suggest: "The motion seeks nothing more than a mandatory injunction directing the authorities to assign these eleven first graders in accordance with practices in existence prior to the assignment of the children to P.S. 135."

7. The appeal referred to in this letter is an administrative proceeding before the New York State Commissioner of Education in which the sole issue is whether the inter-district agreement between Districts 18 and 23 is of continued vitality beyond the school year 1971–72.

8. A simultaneous request to direct Tilden Houses junior high school students to Junior High School 252 rather than Junior High School 285 was quickly rejected as unacceptable. No similar objection was received with respect to the elementary school plan.

On that issue, the court, in an opinion filed November 13, 1972, found that plaintiffs had failed to demonstrate a likelihood of success either on the issue of unlawful motivation or of unlawful effect of the assignment of the Tilden Houses children to P.S. 135; found that plaintiffs had failed to show that irreparable harm would result from the denial of the requested preliminary injunction; and refused to reach the local issues of whether the procedures outlined in Special Circular No. 58 had been followed, and whether the inter-district agreement between Districts 18 and 23 was valid. Accordingly, the motion for preliminary injunction was denied.

For the reasons stated below, we affirm.

## II.

### EQUAL PROTECTION CLAIM

#### (A) *Preliminary Injunction Standard*

■ We repeatedly have emphasized the heavy burden on a party seeking the extraordinary remedy of preliminary injunctive relief. The standard that has evolved is that the moving party "assume[s] the burden of demonstrating *either* a combination of probable success and the possibility of irreparable injury *or* that [it has] raised serious questions going to the merits and that the balance of hardships [tips] sharply in [its] favor." Stark v. New York Stock Exchange, 466 F.2d 743, 744 (2 Cir. 1972) (emphasis added); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2 Cir.), cert. denied, 394 U.S. 999 (1969). We find that standard to be particularly appropriate here where there is a strong public interest in the outcome of the dispute. See, e.g., Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., 476 F.2d 687, 692–93, 698–99 (2 Cir. 1973); Exxon Corp. v. City of New York, 480 F.2d 460, (2 Cir. 1973).[9]

■ With this standard in mind, we turn to an examination of the evidence adduced at the hearing below, recognizing that in reviewing the denial of a motion for a preliminary injunction our role is limited. "A clear abuse of discretion . . . must be shown to an appellate court in order to obtain a reversal of the trial court's denial of temporary injunctive relief." Checker Motors Corp. v. Chrysler Corp., *supra*, 405 F.2d at 323; Dino de Laurentiis Cinematografica, S.p.A. v. D–150, Inc., 366 F.2d 373, 374–75 (2 Cir. 1966).

#### (B) *Probability of Success*

■ The district court's conclusion that "plaintiffs have not shown the requisite likelihood of success" was based on what it found to be a failure of proof with respect to the following alleged facts:

"(1) that excluding Tilden Houses children from the first grade of P.S. 244 on September 11th and 12th was racially motivated;

(2) that the almost exclusive attendance of one race in three elementary schools in the district is the result of present or past discriminatory action by the state. [citing Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 26 (1971)];

(3) that the action of Community School Board No. 18 in assigning the

9. The suggestion has been made that this standard may be inapplicable in a civil rights case once a prima facie showing of discriminatory effect has been made. It is true that, where the appropriate showing is made at a trial on the merits, the burden will shift to the defendant. Chance v. Board of Examiners, 458 F.2d 1167, 1176 (2 Cir. 1972). While that rule may be relevant in evaluating a plaintiff's likelihood of success at trial, it does not change the basic equation by which a motion for preliminary injunction is assessed. We therefore see no reason to apply any different standard in a civil rights or other constitutional action than in any other case at this procedural stage. See, e. g., Inmates of Attica Correctional Facility v. Rockefeller, 453 F.2d 12, 20 (2 Cir. 1971).

children to P.S. 135 created or aggravated segregation at P.S. 135;

(4) that there is a causal connection between the Community School Board's alleged practices and policies and the claimed condition of unequal educational opportunities." (footnote omitted).

The district court's findings, taken together, that plaintiffs had failed to adduce evidence to support the foregoing claims led it to conclude that plaintiffs had not satisfied their burden of demonstrating either intent to discriminate or a de facto discriminatory effect. We agree.

### (1) Discriminatory Motive

The parties have devoted much of their efforts, both at the hearing below and on this appeal, to the question whether proof of a discriminatory motive on the part of the appellees is an element of appellants' case, either in the sense that it must precede an inquiry into the effect of the allegedly discriminatory action, or, indeed, in the sense that unlawful intent alone will entitle appellants to the relief requested. We shall consider each of these matters separately.

■ It is now well established that a plaintiff alleging unlawful discrimination in violation of the equal protection clause of the Fourteenth Amendment is not required to prove that a discriminatory motive preceded the unlawful effect. In Wright v. Council of the City of Emporia, 442 F.2d 570 (4 Cir. 1971) (en banc), the Fourth Circuit reversed the grant of an injunction against the establishment of a new school district, despite the discriminatory effect of the re-districting plan, because neither a "modification of the [existing] racial balance" nor a retention of "as much . . . separation of the races as possible" was the "dominant purpose" of the re-districting. 442 F.2d at 572. The Supreme Court, in reversing, 407 U.S. 451 (1972), emphatically rejected the Fourth Circuit's approach:

"This 'dominant purpose' test finds no precedent in our decisions. It is true that where an action by school authorities is motivated by a demonstrated discriminatory purpose, the existence of that purpose may add to the discriminatory effect of the action by intensifying the stigma of implied racial inferiority. . . . But as we said in Palmer v. Thompson, 403 U.S. 217, 225 [1971], it 'is difficult or impossible for any court to determine the "sole" or "dominant" motivation behind the choices of a group of legislators', and the same may be said of the choices of a school board. . . . *Thus, we have focused upon the effect—not the purpose or motivation—of a school board's action. . . . The existence of a permissible purpose cannot sustain an action that has an impermissible effect.*" 407 U.S. at 461–62 (emphasis added). Cf. Chance v. Board of Examiners, 458 F.2d 1167, 1175–76 (2 Cir. 1972). Upon the facts before us, therefore, it is not enough to say, see *infra*, that the evidence before the district court failed to disclose a likelihood that appellants will prove that appellees assigned the Tilden Houses children to P.S. 135 with an intent to discriminate against them, if appellants successfully can demonstrate that those assignments in fact discriminated against them.

The second possible importance of alleged unlawful motive, as claimed by appellants, is to lay the basis for relief in and of itself. As the Supreme Court noted in Palmer v. Thompson, 403 U.S. 217, 225 (1971), that is a position not without some support in the cases. In Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 231 (1964), for example, the Court stated, "[w]hatever non-racial grounds might support a State's allowing a county to abandon public schools, the object must be a constitutional one, and grounds of race and opposition to desegregation do not qualify as constitutional." Similarly, in Gomillion v. Lightfoot, 364 U.S. 339 (1960), the Court said:

"When a State exercises power wholly within the domain of state interest, it is insulated from federal ju-

dicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right. This principle has had many applications. It has long been recognized in cases which have prohibited a State from exploiting a power acknowledged to be absolute in an isolated context to justify the imposition of an 'unconstitutional condition'. What the Court has said in those cases is equally applicable here, *viz.*, that 'Acts generally lawful may become unlawful when done to accomplish an unlawful end, and a constitutional power cannot be used by way of condition to attain an unconstitutional result.'" 364 U.S. at 347–48 (citations omitted).

The effect of that language, however, was severely undercut in *Palmer*. As the Court there observed, despite the potential impact of language in *Griffin* and *Gomillion*, the focus of those cases "was on the actual effect of the enactments, not upon the motivation which led the States to behave as they did." 403 U.S. at 225. The Court recalled that "no case in [the Supreme Court] has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." 403 U.S. at 224. Presumably the same would apply to the motives which led to action by the Community School Board and the individual appellees.

That does not end our inquiry, however, as to the relevance of a finding of official unlawful intent. In Wright v. Council of the City of Emporia, *supra*, as quoted above, the Supreme Court observed that "where an action by school authorities is motivated by a demonstrated discriminatory purpose, the existence of that purpose may add to the

discriminatory effect of the action by intensifying the stigma of implied racial inferiority." 407 U.S. at 461. It is therefore appropriate to consider the evidence adduced at the hearing on the issue of the motive of appellees.

In our view, the record below clearly supports the district court's conclusion that at this stage there is insufficient evidence to impute to Community School Board No. 18 and the individual appellees a racial motivation in assigning the Tilden Houses children to P.S. 135 rather than to P.S. 244. While we recognize that the instant dispute has been both a product and cause of severe racial tensions among the affected parent and resident groups, appellants have not demonstrated a sufficient probability of proving racial motivation on the part of appellees.

The only possible evidence of official ill-motive was the testimony of appellant Sarah Tatum. In relating the events of September 12, 1972, Mrs. Tatum testified that, after most of the Tilden Houses parents had gone into the auditorium of P.S. 244 to be registered by Assistant Superintendent Schreiber, she remained in the hallway while her son went to the school lavatory. Also in the hallway were a number of parents of children who previously had attended P.S. 244, most of them white.[10] She testified that the following occurred:

> "At this point Mr. Garner, the Acting Superintendent of District 18, walked into the hall.
>
> And they [the P.S. 244 parents] were saying—they threw up their hands—'I thought you said they wasn't coming in here.'
>
> He walked over to the group and he said, 'Calm yourselves down. I prom-

---

10. A rather pointed contradiction in the evidence concerned the presence of black parents among the P.S. 244 contingent protesting the registration of Tilden Houses children. During the testimony of appellant Mrs. Bulena Pride, for example, a colloquy ensued during which the court inquired whether any black parents of children at P.S. 244 objected to the Tilden Houses children. Mr. Jones, counsel for appellants, responded, "There was at the most one black parent who may have spoken out." Acting Superintendent Garner, however, testified that when he arrived at P.S. 244 on September 12, "there were large numbers of neighborhood peo-

ised you they were not going to come in. We have held out this long and they haven't gotten in.'

He said, 'They aren't coming in now.'

They said, 'Do we have your word?'

He said, 'You have my word. You can go home. Calm yourselves down. You have my word.' "

Viewed in context, this exchange aroused the suspicions of Mrs. Tatum and the other appellants as to Mr. Garner's neutrality and objectivity. It would be both misleading and improper to ignore either the immediate setting or the broader atmosphere of fear and distrust in which the opposing groups were operating.[11] Cf. Reitman v. Mulkey, 387 U.S. 369, 373 (1967); Kennedy Park Homes Association v. City of Lackawanna, 318 F.Supp. 669, 694 (W.D. N.Y.), aff'd, 436 F.2d 108 (2 Cir. 1970), cert. denied, 401 U.S. 1010 (1971). Nevertheless, since this was the only hard evidence of unlawful motivation adduced, it was not unreasonable for the court to have concluded that appellants failed to show that the decision to exclude the Tilden Houses children from P.S. 244—a decision that resulted in their being assigned to a comparable, nearby school also in District 18—was motivated by an intent to discriminate against them on the basis of race. For the narrow purposes of *Wright*—i. e. to determine whether the existence of a discriminatory motivation served to intensify the stigma of implied racial in-

feriority—such evidence is of even less probative value.

The critical remaining question, to which we now turn, is whether appellants demonstrated a probability of proving a discriminatory *effect*, apart from that resulting from the alleged unlawful motive.

## (2) Discriminatory Effect

 As indicated above, the Supreme Court has made it clear that it is the *effect* of state action that is to control a claim for relief under the equal protection clause of the Fourteenth Amendment. In other words, if appellants have demonstrated a reasonable probability that they can prove that the assignment of Tilden Houses children to P.S. 135 rather than in accordance with prior practice served to discriminate against them in violation of the equal protection clause, then they are entitled to the preliminary injunction requested, regardless of the presence or absence of unlawful motive.

The statistical evidence below disclosed that the racial composition of the five elementary schools in question, as of October 29, 1971, was as follows:

| School | % Utiliza-tion [12] | % "Negro" | % "Puerto Rican" | % "Other" |
|---|---|---|---|---|
| P.S. 135 | 91 | 53 | 11 | 36 |
| P.S. 233 | 79 | 48 | 12 | 40 |
| P.S. 235 | 98 | 53 | 11 | 36 |
| P.S. 244 | 88 | 46 | 8 | 46 |
| P.S. 268 | 105 | 70 | 10 | 20 |

Focusing on the two schools principally at issue, it will be noted from the above

ple, which included both blacks and whites. And I have the names, if you care for me to identify those people of the black community who were present." Garner further testified, in response to a question about the position of the P.S. 244 parents:

"Both black and white parents of 244—and I point out that there are twelve to fifteen black members of the Executive Board of the P.T.A. at 244—had taken the unanimous position that they couldn't accept any new children to their school because of their concern for the very crowded conditions on many of the grades."

While we do not belabor the importance of this inconsistency in the evidence, we do note that perhaps some of the sting of Mr. Garner's statement to the parents (set out in the text following this note) is relieved by the presence of even some black parents among the group.

11. We take particular note in this regard of the continuing attempt by District 18 to exclude Tilden Houses residents from *all* of its schools right from the outset of decentralization.

12. As of June 29, 1972.

that P.S. 244, the transferor school, is slightly less utilized than P.S. 135, the transferee school. As the evidence made clear, however, the critical question for present purposes is utilization in a particular grade. In the first grade, the subject of this appeal, P.S. 244 has 101 registered children in four classes, an average of 25 per class. P.S. 135 has 104 first grade children in five classes, an average of 21 per class. On a utilization criterion, therefore, the assignment of Tilden Houses children to P.S. 135 would be at least numerically justifiable.

As a constitutional matter, however, the essential question is whether there is a racial imbalance between the two schools rising to a level which violates the equal protection clause. We note first that "[t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole,"[13] nor is there a requirement of any particular racial balance or mix. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 24 (1971); Lawlor v. Board of Education of the City of Chicago, 458 F.2d 660, 662 (7 Cir. 1972). Indeed, at least one court has held that there is no right to a precise racial balance within even a single school district, the guarantee only extending to the availability of a "unitary" school system. Bradley v. School Board of City of Richmond, 462 F.2d 1058 (4 Cir. 1972) (en banc), aff'd per curiam by equally divided Court sub nom. School Board of City of Richmond v. State Board of Education of Commonwealth of Virginia,

412 U.S. 92 (1973). If anything, the authority of Swann would appear to be even more compelling where a school system is asked to reinstate a past alignment, perhaps outdated, rather than to dissolve a dual, segregationist assignment practice. See also Keyes v. School District No. 1, Denver, Colorado, 445 F. 2d 990, 1006 (10 Cir. 1971), rev'd, —— U.S. —— (1973); Norwalk CORE v. Norwalk Board of Education, 298 F.Supp. 213 (D.Conn.1969), aff'd, 423 F.2d 121 (2 Cir. 1970).

In the present case, the difference in black enrollment in the two schools involved is only 7 per cent. In Swann, the Court permitted variations in black enrollment ranging from 9 per cent in one school to 38 per cent in another.[14] Other cases have tolerated considerably greater disparities, even in the context of court-ordered desegregation plans.[15] The point is not that these variations are justifiable in the abstract. Rather, they reflect the reality that every school system is different and "every plan must take into consideration the unique characteristics of the school district to be served. What may be practical in one district may not be applicable in another." Thompson v. School Board of the City of Newport News, Virginia, 465 F.2d 83, 86 (4 Cir. 1972) (en banc); Green v. County School Board of New Kent County, 391 U.S. 430, 439 (1968).

■ Here, the assignment of Tilden Houses children to P.S. 135 reflects a rational decision within the scope of the Community School Board's discretion. It was aimed at balancing the sizes of the first grade classes in the district's

13. The figures for all elementary schools in District 18 as of October 29, 1971 disclose a racial composition among the approximately 13,000 students of 32% "Negro", 6% "Puerto Rican" and 62% "Other". Three of the thirteen schools had a combined black and Puerto Rican enrollment of less than 2%, while a fourth had a black and Puerto Rican enrollment of 89%. But see note 14, infra.

14. We emphasize again that the wide variations in racial mix in the schools throughout District 18 is of no legal consequence on this appeal. The sole issue here is the constitutionality of the assignment of Tilden Houses children to P.S. 135 rather than to that and other schools in accordance with past practice.

15. See, e. g., Robinson v. Shelby County Board of Education, 467 F.2d 1187 (6 Cir. 1972), where the figures stated in the dissenting opinion demonstrate that the desegregation order permitted the retention of several virtually one-race schools. Id. at 1188–1205.

schools without seriously affecting the racial balance within the district. We are unable to conclude otherwise simply on the basis of the 7 per cent difference in black enrollment between the two schools affected. Certainly such difference is not one of constitutional significance.

### (C) *Irreparable Harm*

■ We turn now to the second branch of the preliminary injunction standard: whether plaintiffs sustained their burden of demonstrating irreparable harm. The district court held that "[p]laintiffs have . . . failed to show that irreparable damage will accrue through denial of the preliminary injunction."

In contending that the court erred in reaching that conclusion, appellants focus on the venerable expression of concern in Brown v. Board of Education, 347 U.S. 483, 494 (1954), that to separate black school children from "others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." While we fully recognize the anguish and frustrations that have been present throughout this controversy, the record before us fails to demonstrate any likelihood that appellants will suffer irreparable harm as the result of the denial of their motion which was directed *solely* at the assignment of the Tilden Houses children to P.S. 135.

There are many obvious distinctions between this case and *Brown*. What we deem most relevant, and dispositive on the question of irreparable harm, are the facts that (1) the instant case is not one involving segregation, either de jure or de facto; and (2) the assigned school, P.S. 135, is one likely to provide an educational experience at least as productive and beneficial as that offered by P.S. 244—not in an unlawful "separate but equal" sense, but in a permissible "alternative" sense.

The irreparable emotional harm which the Court in *Brown* feared would result from the preservation of a segregated school system has not been shown to be a real danger in the present case. As we have stated above, there is insufficient evidence in the record to suggest either an intent to separate these children from the white children in the district, or an accomplishment of that end. The children have been assigned to a school with a 53% black enrollment rather than to one with a 46% black enrollment—in a school district with a total black registration of 32%. Absent any evidence whatsoever of the kind of psychological impact from this re-assignment urged by appellants on appeal, it would have been improper to enjoin the school board on this elusive ground.

■ We recognize that a finding of this sort of harm to the children is not essential where an invidious discrimination itself is shown. The test to be applied in cases alleging de facto racial discrimination is whether artificial barriers have been imposed by the school district which have resulted in a denial of equal educational opportunity to the affected group. Deal v. Cincinnati Board of Education, 369 F.2d 55, 59–60 (6 Cir. 1966), cert. denied, 389 U.S. 847 (1967).

The record before us clearly negates any such assertion here. Uncontradicted evidence disclosed that the educational opportunity at P.S. 135 was in all respects equivalent, and in many respects superior, to that available at P.S. 244. The testimony of Acting Superintendent Garner revealed, for example:[16]

1. That the reading and mathematics scores as measured by the City's Metropolitan Achievement Test

---

16. A similar inquiry into the relative merits of district schools is reflected in the opinions of the district and circuit courts in Keyes v. School District No. 1, Denver, Colorado, 313 F.Supp. 61, 78–81 (D. Colo.1970), aff'd in part, 445 F.2d 990, 1003–04 (10 Cir. 1971), rev'd, —— U.S. —— (1973).

are higher on each grade level at P.S. 135 than at P.S. 244. The similarity in background of the student bodies of the two schools therefore suggests a superior educational program at P.S. 135.

2. That the percentage of permanently-appointed teachers at P.S. 135 is 97%, as compared with 73% at P.S. 244, indicating a higher percentage at the latter of either per diem substitute teachers or full-time teachers who have not met state standards for certification.

3. That the lunch room facilities at P.S. 135 are less crowded and better maintained than those at P.S. 244.

4. That there are less than half the number of bused students at P.S. 135 than at P.S. 244, indicating fewer safety hazards associated with busing.[17]

5. That, as stated above, the first-grade classes at P.S. 135 are less crowded.

6. That the parents and surrounding community of P.S. 135, in stark contrast to their counterparts at P.S. 244, have been receptive to the enrollment of Tilden Houses children.

7. That the school has been equipped with additional personnel qualified to deal with any special or additional services required by the Tilden Houses children.

The district court found that there are other comparisons between P.S. 135 and P.S. 244 which are favorable to P.S. 135. That is not to say of course that racial discrimination in District 18 could be overcome by providing a comparable, or even a better, facility for Tilden Houses children. Any such theory was buried by *Brown*. Nevertheless, even where there is insufficient evidence of motive in separating the races, or insufficient evidence of an adverse result from such separation, the state is still under a duty to provide equal educational opportunity on a non-discriminatory basis. Upon the facts before us, we are satisfied that the District 18 Community School Board adequately discharged that duty in assigning Tilden Houses children to P.S. 135.

On the basis of the district court's findings of fact, which are supported by clear and convincing evidence, we hold that appellants have not demonstrated a likelihood that irreparable harm will result from the denial of their motion for a preliminary injunction.

(D) *Balance of Hardships*

Finally, in reviewing the district court's denial of the motion for a preliminary injunction, we must consider whether the balance of hardships tipped so sharply in favor of the moving party, the appellants, as to have warranted the grant of preliminary relief. The question here is not as simple as assessing which party stands to suffer more from the grant or denial of the injunction. What is involved is an evaluation of where the equities lie, considering in addition to the hardships such factors as the uncertainty of the questions raised and the probable outcome of the dispute on the merits.

In the present case, an examination of the balance of hardships necessarily involves many of the same elements referred to in our discussion of whether irreparable harm had been shown. We shall not repeat them here. We believe that appellees have fairly summarized the situation: "The children have not been wrenched from a school earlier attended by them. A temporary injunction would not restore them to 'status quo'. It is a fair inference that their education will not be advanced by a mid-semester transfer to a different class conducted by a different teacher in a different school." And that is rein-

---

17. Tilden Houses children would be bused to either school, both being more than one mile from the students' home addresses.

forced by the passage of time since the district court's decision.

■ Accordingly, in view of the improbability that appellants will succeed at trial on the merits of their claims and their failure to demonstrate a likelihood of irreparable harm or that the balance of hardships tips decidedly in their favor, we hold that the district court correctly denied the motion for preliminary injunction.

### III.

#### STATE ADMINISTRATIVE CLAIMS

The complaint also raises questions of the validity of the re-assignment of the Tilden Houses children to P.S. 135 as a matter of state law. Essentially, the claim is that the procedures outlined in Special Circular No. 58, see note 3, *supra*, were not followed at two stages: (1) the May 24, 1971 inter-district agreement between District 18 and District 23; and (2) the September 19, 1972 request for an intra-district zoning change whereby all first-grade Tilden Houses children would be assigned to P.S. 135.

The district court refused to rule on the merits of those claims. It held that "assuming the violation and invalidity of the agreement, such actions did not establish or maintain segregation or deny equal educational opportunities to Black children from Tilden Houses. These claims are state claims that do not reach Constitutional grounds."

■ Treating these claims as ones of pendent jurisdiction, the threshold question is whether the district court had the *power* to determine what in all respects are issues of state law. In United Mine Workers v. Gibbs, 383 U.S. 715 (1966), the Supreme Court analyzed the problem as follows:

"Pendent jurisdiction, in the sense of judicial *power*, exists whenever there is a claim 'arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ,'

U.S.Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case'. The federal claim must have substance sufficient to confer subject matter jurisdiction on the court. Levering & Garrigues Co. v. Morrin, 289 U.S. 103. The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole." 383 U.S. at 725 (emphasis by the Court) (footnotes omitted).

We have no doubt that the district court had the power to decide the issues of state law presented to it: there was a substantial federal constitutional claim which vested the court with subject matter jurisdiction; the state and federal claims derived from a "common nucleus of operative fact" (i. e., the re-assignment of Tilden Houses children in a manner not in accordance with prior practice); and the state and federal claims comprised one "constitutional case" so that appellants normally would be expected to try them in one proceeding.

■ As the Court in *Gibbs* made clear, however, that does not end the inquiry, for the constitutional jurisdiction over the state claim—the "power"—"need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." 383 U.S. at 726. See also Leather's Best, Inc. v. S. S. Mormaclynx, 451 F.2d 800, 809, 811 (2 Cir. 1971).

The Court in *Gibbs* also indicated certain guidelines with respect to the kinds of considerations that should enter into the exercise of pendent jurisdiction dis-

cretion. On the side of asserting jurisdiction over pendent state claims, the prevailing factors are "judicial economy, convenience and fairness to litigants", 383 U.S. at 726, particularly where "the state claim is . . . closely tied to questions of federal policy". 383 U.S. at 727. E. g., Leather's Best, Inc. v. S. S. Mormaclynx, *supra*, 451 F.2d at 811. The Court also suggested that refusal to exercise pendent jurisdiction might be proper to avoid "[n]eedless decisions of state law . . . both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." 383 U.S. at 726. E. g., Catalano v. Department of Hospitals of City of New York, 299 F.Supp. 166, 175 (S.D.N.Y. 1969). This would include cases where the federal claims are dismissed before trial because of insubstantiality, compare Rosado v. Wyman, 397 U.S. 397, 404–05 (1970) (dismissal of federal claim for mootness; proper exercise of discretion to decide state claim); Gem Corrugated Box Corp. v. National Kraft Container Corp., 427 F.2d 499, 501 n. 1 (2 Cir. 1970) (dismissal of federal claim by stipulation; proper exercise of discretion to decide state claim); where the state issues substantially predominate, see General Foods Corp. v. Struthers Scientific and Int'l Corp., 297 F. Supp. 271, 275–76 (D.Del.1969); or where the state questions are both difficult and unresolved, and would be better served by review in a state proceeding, e. g., Winnick v. Manning, 460 F.2d 545, 550 (2 Cir. 1972).

At the very least, the present case appears to fall into the latter category. The pendent claims involve questions solely of local administrative law, heretofore not directly decided in any case of which we are aware. Here, as in *Winnick,* the state issues "would have required the district court to make a detailed review of [New York City decentralization] procedures and decisions under state law. The state courts provide an adequate and more suitable forum for these claims." 460 F.2d at 550.

 We hold that, while the district court had the power to decide the pendent claims under *Gibbs,* it did not abuse its discretion in declining to do so.

In affirming the district court's denial of appellants' motion for preliminary injunction, we suggest to the district court that it expedite further proceedings in this case, as it so commendably has done to date, with a view to the earliest possible date for trial on the merits consistent with the rights of the parties—in the interest of preventing this situation from infecting yet another school year.

Affirmed.